Filed 6/5/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S080837 |
| v. | ) | |
| | ) | |
| DONALD RAY DEBOSE, | ) | Los Angeles County |
| | ) | Super. Ct. No. YA035529 |
| Defendant and Appellant. | ) | |
| _____ | ) | |

A jury convicted defendant Donald Ray Debose of the first degree murder and second degree robbery of, and arson causing great bodily injury to, Dannie Kim (Pen. Code, §§ 187, subd. (a), 189, 211, 212.5, 451, subd. (a)),[1] and it found true special circumstance allegations that Kim's murder took place during the commission of arson and robbery (§ 190.2, subd. (a)(17)). The jury convicted defendant of the attempted premeditated murder and second degree robbery of Vassiliki Dassopoulos. (§§ 187, subd. (a), 211, 664, subd. (a).) It also found true sentencing enhancement allegations that defendant personally used a firearm in committing the murder, attempted murder, and robberies (§ 1203.06, subd. (a)(1), former § 12022.5, subd. (a)(1)), and personally inflicted great bodily injury during the attempted murder and robberies (former § 12022.7, subd. (a)). As to victim

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

1

Kim, the jury was unable to reach a verdict on two counts of anal and genital penetration by a foreign object, or on alleged special circumstances that her murder occurred during the commission of rape by instrument and involved the infliction of torture. A mistrial was declared on these counts and special circumstances.

At the penalty phase, the jury returned a verdict of death. The trial court denied defendant's motions for modification of the verdict (§ 190.4, subd. (e)) and for a new trial. For the crimes against Kim, the court sentenced defendant to death for the first degree murder with special circumstances and to 10 years' imprisonment for the gun-use enhancement, one year for the robbery, and nine years for the arson. For the crimes against Dassopoulos, the court sentenced defendant to life imprisonment with the possibility of parole for the attempted murder, plus three years for the great bodily injury enhancement and one year eight months for the firearm enhancement, and one year for the second degree robbery, plus three years for the great bodily injury enhancement and one year eight months for the firearm enhancement. The court ordered the sentences for the crimes against Kim and Dassopoulos to run consecutively.[2]

---

[2] For the crimes against Kim, defendant was tried with two codefendants, Carl Higgins and Anthony Flagg, who were found guilty of first degree murder, second degree robbery, and arson causing great bodily injury. The jury found true special circumstance allegations that the murder was committed during an arson and a robbery. At the penalty phase, the jury returned a verdict against each codefendant of life imprisonment without the possibility of parole. The trial court sentenced each codefendant to life imprisonment without the possibility of parole for the first degree murder with special circumstances, plus 10 years for the robbery and arson. The Court of Appeal vacated the jury's arson-murder special-circumstance findings, but otherwise affirmed the judgment. (See *People v. Flagg* (July 17, 2002, B135685) [nonpub. opn.].)

This appeal is automatic.  (§ 1239, subd. (b).)  We vacate the arson-murder special-circumstance finding, but otherwise affirm the judgment.

## I.  FACTS

### A.  The Guilt Phase

During the early morning of December 17, 1997, security cameras at the Hollywood Park Casino in Inglewood, California, recorded the movements and interactions of defendant and codefendants Carl Higgins and Anthony Flagg.  In the video footage shown at trial, the three men appeared to monitor the gambling activities of Dannie Kim.  After Kim collected her winnings, the men followed her out of the casino.  A few hours later, firefighters called to the scene of a car fire discovered Kim alive, locked in the trunk.  She had been shot several times and her body was badly burned.  Abrasions and tears found in the genital region suggested she had been sexually assaulted.  Kim died five days later from her injuries.

During the early morning of December 23, 1997, Hollywood Park Casino security cameras again recorded defendant, this time with Derrick Grey, as the two men watched the gambling activities of Vassiliki Dassopoulos.  After Dassopoulos cashed in her poker chips, they followed her out of the casino.  As Dassopoulos pulled into her home garage, defendant attacked and robbed her, shooting her in the head.  She survived.  Three days later, police arrested defendant at the casino.  He had Dassopoulos's credit card on his person.  Later testing of a gun found under the front passenger seat of defendant's car confirmed that the gun had been used in the Kim and Dassopoulos shootings.

At trial, defendant presented an alibi defense.  Codefendant Higgins challenged the prosecution's eyewitness testimony, while codefendant Flagg

3

presented eyewitness and alibi testimony, as well as expert testimony to rebut the sexual assault evidence.

### 1. The prosecution's case

#### a. Crimes against Dannie Kim

On December 16, 1997, Kim, who was from Washington State, had been visiting her sister, Miah Richey, in Los Angeles for several days. At 3:00 p.m. that afternoon, they met at the Hollywood Park Casino, a place that Kim, a professional card player, frequented during her visits. Kim drove her Chrysler LeBaron to the casino. About 11:00 p.m., Kim told Richey "to go home," saying she would be "right behind her." Richey left the casino and did not see her sister again that night. The next morning, Richey noted Kim had not come home. She did not consider it unusual because Kim would sometimes spend the entire night at the casino, forgetting to call. Richey called Kim on the cell phone Richey had loaned her but did not reach her.

Around 5:00 a.m. on December 17, 1997, Rosemarie Howard was in her home on South Osage Avenue in Inglewood, across the street from Kelso Elementary School, when she heard "a woman talking extremely loudly outside." About five to 10 minutes after the woman stopped talking, Howard heard approximately five gunshots fired in rapid succession. Fifteen minutes later, an explosion shook her apartment building. Howard ran outside, saw that a car was on fire, and told a neighbor to call 911.

About 5:15 a.m. that morning, Willard Lewis and a prostitute were parked on South Osage Avenue in Lewis's car. Some 20 minutes later, Lewis heard people arguing. He saw two men, whom he identified at trial as defendant and codefendant Higgins, arguing with an Asian woman as the three stood near the end of a car. The woman, who looked "beat up in the face," repeatedly said "no, no,

no." Lewis saw defendant grab the woman by the arm and pull her towards him, while Higgins stood behind the woman. Lewis also thought he saw the silhouette of a third person leaning into the car. The argument continued for five to 10 minutes. Lewis did not come to the woman's aid because he was married and should not have been there with a prostitute and therefore did not want to get involved.

As Lewis lay down on his car seat, he heard a door or trunk slam shut, followed by three or four gunshots. When he looked, he saw defendant tuck something into his clothing. Lewis then heard Higgins say, "Come on, Don." Lewis waited a few minutes until he felt it was safe to leave. He then drove around the corner to a telephone, where the prostitute called 911. When Lewis returned 20 minutes later, the car where the shooting had occurred was on fire.

That same morning, Valerie Hutchinson-Gluck, a teacher at Kelso Elementary School, came to work between 6:15 a.m. and 6:30 a.m. and saw a man standing outside a car parked near the school's entrance. He was wearing dark, baggy clothing and leaning into the driver's side window at a 90-degree angle. It struck Hutchinson-Gluck as "peculiar" to see someone there so early in the morning. A short time later, a student told her that a car outside the school was on fire and that a body had been found inside it. Realizing it was the same car she had seen the man leaning into, Hutchinson-Gluck went to speak to a police officer at the scene.

Around 6:30 a.m., Inglewood firefighters at the scene in response to 911 calls saw a parked Chrysler LeBaron on fire. It took about 10 minutes to put out the fire, at which time a semiconscious woman was discovered in the car's trunk. She had third-degree burns on the left side of her body and had been shot in the torso and left arm. The victim had a pulse and was breathing, but paramedics were unable to get a blood pressure reading.

5

Using the burned car's license plates, Inglewood Police Department Detective Craig Lawler obtained a copy of Kim's driver license, but because of the severity of Kim's injuries, Lawler was unable to positively identify Kim from the photograph on the license. On December 18, Lawler met with Richey to discuss the possibility that the victim might be her sister. Richey then went to the hospital, where she confirmed Kim's identity. She was only able to recognize Kim by her fingernails, which Richey had painted a few days before.

Chris McClung, a registered nurse and sexual assault examiner, examined Kim in the hospital two days after the attack, while Kim was unconscious and in critical condition. In McClung's opinion, there was a strong possibility Kim had been sexually assaulted. Evidence of vaginal penetration included a healing abrasion, possible bruising of the hymen, and redness and swelling of the vaginal canal. McClung conceded, however, that the redness and swelling could also have been caused by renal failure and infection. Based on multiple tears and abrasions, redness, and swelling found in the anal area, McClung expressed the opinion that Kim had also been assaulted rectally.

Los Angeles County Sheriff's Department criminalist Don Johnson testified that the lack of semen found on Kim did not negate the possibility of sexual intercourse. He explained that the likelihood of detecting semen decreases over time, and that hospital personnel had washed Kim's body by the time the sexual assault kit samples were collected. Also, the perpetrator might not have ejaculated, a condom could have been used, the volume of the ejaculation could have been low, or a foreign object could have been used. Semen, furthermore, is less likely to be present in the rectum due to defecation and bacteria.

Dr. Lee Boohacker of the Los Angeles County coroner's office performed Kim's autopsy. He testified that Kim died from multiple gunshot wounds and thermal burns. A total of 50 to 55 percent of her body had second and third degree

burns. A reddish color at the edge of the burned areas indicated Kim was alive when she was burned. Kim's right leg had to be amputated above the knee because of burn damage. Her clavicle was fractured in multiple places. This injury, which was not associated with any bullet wound, occurred before death but after she left the casino.

Dr. Boohacker also testified that Kim's injuries were consistent with her having been sexually assaulted both vaginally and rectally. He noted five irregular tears at different angles in Kim's anus as having been produced by a large foreign object or by repeated blows from a blunt object. The possibility that these injuries were caused by a rectal thermometer was "extremely remote, almost impossible." He also noted that Kim's vulva and labia majora were "quite swollen," and that there were two superficial vaginal tears consistent with blunt force.

Los Angeles County Deputy Sheriff Michael Cofield, an arson and bomb expert, examined Kim's car. He testified that the fire was intentionally set by the ignition of gasoline. The fire originated in the right front passenger floorboard area, where the smell of the gasoline was "really strong."

A partially burnt Hollywood Park Casino poker chip found on the floor of Kim's car led detectives to examine the casino's surveillance tapes. The tapes showed that Kim drove her car into the casino's VIP parking lot at 10:56 a.m. on December 16, 1997; that she entered the casino through the VIP entrance; and that she then played poker in the VIP area for several hours. At 2:34 a.m. on December 17, a car carrying defendant, Higgins, and Flagg drove into the casino's parking lot. The three men entered the casino together. Starting around 3:00 a.m., they appeared to focus their attention on Kim; they took turns walking around the VIP area and stopping several times to observe Kim's gambling activities. At 3:50 a.m., as Kim was cashing in poker chips totaling $1,900, the three men gathered

7

less than 100 feet away from her. When Kim left the casino, so did the men. Kim left the casino parking lot in her car followed by the men in their car.

### b. Crimes against Vassiliki Dassopoulos

Around 7:00 p.m. on December 22, 1997, professional card player Dassopoulos went to the Hollywood Park Casino. She had $4,000 in cash when she arrived and $4,725 when she finished gambling. She left the casino shortly before 5:00 a.m. the next morning and drove to San Bernardino. It was still dark when she arrived at her home.

After entering the garage and opening her car door, Dassopoulos saw something in her peripheral vision, "like a body." A person whom she later identified at trial as defendant grabbed the door and dragged her out of the car. He then drew a gun from his waistband. As the two struggled, defendant put his left hand and arm across her neck in a chokehold, placed the gun against her head, and shot her. She fell to the floor and passed out. When Dassopoulos regained consciousness, she was bleeding heavily but was able to crawl to the garage door and yell for help.

Paramedics took Dassopoulos by helicopter to the hospital. A bullet had gone into the back of her head behind her right ear and passed through her head to the left side of her cheek behind the left corner of her mouth. As a result of her injuries, Dassopoulos could no longer drink without using a straw and her tongue was paralyzed. She had also lost her right vocal cord. At the time of trial, she could only speak in a low voice and suffered from bouts of dizziness.

Composite videos from casino security cameras showed that at 7:22 p.m. on December 22, Dassopoulos walked into the Hollywood Park Casino through the VIP entrance and proceeded to play poker for several hours. At 4:08 a.m. the next morning, the same car that a few days earlier had followed victim Kim from

8

the casino entered the parking lot. Defendant and Derrick Grey got out of the car and went straight into the VIP area. At that time, Dassopoulos was at a poker table with almost $2,000 worth of chips stacked in front of her. Defendant and Grey immediately appeared to focus on Dassopoulos's gambling activities, walking by and stopping to watch her play several times. At 4:40 a.m., Dassopoulos cashed in her chips and then left in her car, followed by defendant and Grey in their car.

### c. Defendant's arrest

On December 25, 1997, police officers monitoring the Hollywood Park Casino from the security surveillance room saw defendant walk into the casino. Around 4:00 a.m., the officers arrested defendant in his car in the casino's parking lot. It was the same car that had followed victims Kim and Dassopoulos. At the time of his arrest, defendant had Dassopoulos's Visa card on his person. A .380 Auto semiautomatic pistol was found under the right front passenger seat of the car. Later, the police arrested codefendants Flagg and Higgins.

### d. Photographic lineups and ballistics evidence

On January 8, 1998, San Bernardino County Deputy Sheriff Ernie Kopasz showed Dassopoulos a photographic "six-pack" containing defendant's photograph while she was still in the hospital. She did not identify anyone at first — she testified that she was confused by the hairstyles in the photographs because her assailant had worn a "beanie cap." When Kopasz simulated a beanie cap with a piece of paper, Dassopoulos selected defendant's photograph as depicting her attacker. She was also shown a photographic six-pack containing Derrick Grey's photograph, but she did not identify him. Dassopoulos did not view a live lineup because she was unable to stand as a result of her injuries.

9

On July 15, 1998, Willard Lewis was shown a photographic six-pack. He identified defendant as the person he had seen grabbing victim Kim.

Los Angeles County Sheriff firearms examiner Richard Catalani test-fired the pistol found in the car in which defendant was arrested and compared the test-fired bullets with the expended bullet and casing from the Dassopoulos shooting. He concluded that the expended cartridge case could have been fired from the pistol and that the bullet was "positively fired from that . . . pistol, and that pistol only." Catalani also compared the test-fired bullets with the ballistics evidence from the Kim shooting. He determined that the three expended bullets found at the crime scene and the bullet that the coroner removed from Kim's body were fired from the pistol found with defendant and from that pistol only. Of the five expended cartridge casings found at the crime scene, he determined that three were definitely fired from that pistol and two could have been fired from it.

### 2. *Defense case*

Defendant presented an alibi defense with respect to the crimes against Kim. Terri Casey, defendant's girlfriend at the time, testified that about 4:30 a.m. on December 17, 1997 (the day Kim was attacked), she responded to a call on her pager from defendant. At his request, she went to the City of Hawthorne, approximately three miles from Inglewood, to pick him up. When she arrived about 5:00 a.m., defendant was alone. Casey dropped defendant off at his home on 58th Street in Los Angeles at around 5:20 a.m.

Codefendant Higgins presented evidence to impeach the eyewitness testimony of Willard Lewis. Corrections Agent Erskine Richmond testified that on January 27, 1998, he forwarded several documents to Higgins. The documents contained details concerning Kim's murder, such as defendant's and his codefendants' names, the location and time of the incident, and the circumstance

10

that defendants had been seen at the casino when Kim was there. Jail records showed that Higgins shared a jail cell with witness Lewis, who was in jail on charges unrelated to the December 17, 1997 crimes against Kim, from May 4 to May 14, 1998. Inmates were allowed to keep documents in their cells. Lewis denied looking at any papers that Higgins had in the shared jail cell.

On direct examination by the prosecution at trial, Lewis said he did not tell anyone until April 1998 that he had witnessed certain events at the December 1997 crime scene. In April 1998, Lewis was in county jail when he saw Higgins. Lewis became concerned that Higgins had seen him on the night of Kim's shooting. He discussed the matter with the jail chaplain.

Stephen Moss, the volunteer chaplain at the Los Angeles County jail, testified that in June 1998 Lewis told him he had witnessed a murder. Lewis explained that he was with a prostitute across the street from a casino in Inglewood when he saw someone shoot a female in a car. Lewis said he could identify the two men involved and that he had seen one of them in jail. With Lewis's permission, Moss gave the information to a police detective investigating Kim's murder.

On direct examination, Lewis admitted that he was a cocaine user and that he supported his habit by stealing. He described himself as a "functional smoker" who could work while under the influence of drugs. On cross-examination, Lewis admitted that on the morning of December 17, 1997, he was in his parked car on South Osage Avenue smoking cocaine and having oral sex with a prostitute.

Lewis said on direct examination that his decision to talk to the authorities was not related to a third strike case then pending against him for commercial burglary and for petty theft with prior convictions for robbery, theft, and drug possession. The prosecution in that case had told Lewis that it would not consider a plea bargain. On cross-examination, Lewis admitted that he had entered a guilty

11

plea in his case, and that he hoped to receive a more lenient sentence as a result of his testimony. When Lewis entered his guilty plea, the trial court stated that it would dismiss a strike and impose a 10-year prison sentence and that it would consider reducing the sentence if Lewis cooperated and testified truthfully at the trial of defendant and his codefendants.

When questioned by the defense, Lewis admitted that when he told his first attorney that he had witnessed a murder, he did not provide all of the details. At the time he pled guilty in his case, Lewis had a new attorney whom he did not tell about the murder because he assumed the new attorney already had this information. He did ask the new attorney whether he could have his sentence reduced if he testified as a witness to a murder. Lewis testified in defendant's case on April 30, 1999, approximately a month before the last day to modify his sentence under section 1170's subdivision (d). He admitted that he intended to ask the court to reduce his sentence based on his testimony in defendant's case.

Deputy Public Defender Charles Cervantes first represented Lewis in his case. According to Cervantes, when he informed Lewis that he was facing a potential life sentence because of his prior convictions, Lewis became concerned. Cervantes thereafter unsuccessfully tried to find a deputy district attorney or judge who was willing to strike some of Lewis's prior convictions so as to lessen the potential sentence. When Cervantes appeared with Lewis at his arraignment on May 13, 1998, Lewis seemed "desperate." On May 20th, Lewis called Cervantes saying he had information about a well-known murder and wanted to know if it could benefit Lewis. As Lewis began stating some of the facts, Cervantes realized his office represented one of the three defendants, which required the public defender to declare a conflict.

Testimony was presented that Lewis was a sales agent, and not a "senior associate" as he claimed, at the company where he was working at the time of

12

Kim's murder. A coworker from that company testified that Lewis had worked there for only three months, during which time he would often "disappear for days." Lewis, as far as the coworker knew, did not own a car in December 1997.

Codefendant Flagg presented the testimony of gynecologist Earl Fuller. Dr. Fuller, who had reviewed the forensic evidence from Kim's autopsy, expressed his opinion that Kim had not been sexually assaulted. He noted that Kim's temperature was taken rectally four times and said that insertion of a thermometer can cause injury to the rectum, particularly in someone who has sustained burn damage to the skin. Dr. Fuller attributed Kim's genital injuries to wiping of the area by medical personnel, use of a catheter, and burns. Additionally, he said Kim's broken clavicle could have been caused by her thrashing about while locked in the trunk of her car.

On cross-examination by the prosecution, Dr. Fuller conceded that less than 1 percent of his practice consisted of treating or observing sexual assault victims. He had served as an expert in only four sex abuse cases, he had attended only one hour of class regarding sexual assaults of child victims, he was not a proctologist, and he did not specialize in burns or fractures. He also conceded that some of Kim's genital injuries were consistent with sexual activity, that Kim's treating physicians had not noted any burns in her genital area, that he never personally examined Kim, and that he had not looked at enlargements of the photographs taken of her.

Codefendant Flagg also presented eyewitness and alibi testimony. Carolyn Jackson, who at the time of trial was in a custodial drug treatment program, testified that she saw a "tall figure" walk by a car parked on South Osage Avenue before it "went up in flames," and that she called 911. Jackson told police the man was "light-complected" and wore a blue jacket and tan pants. She thought she saw

13

him walking earlier with a "short and stubby" woman. Jackson was unable to pick out the man she saw from a photo lineup that included defendant.

Flagg's mother, Gwendolyn Flagg, testified that between 5:00 a.m. and 5:30 a.m. on the morning of the car fire on December 17, 1997, Flagg was in their shared home, which was two blocks from Kelso Elementary School (the area where the crimes against Kim occurred). She confirmed, however, that her son was the person in the black leather jacket and the dark pants described as "suspect number two" in the casino surveillance videos.

### 3. *The prosecution's rebuttal*

Defense investigator Joe Brown testified that defendant told him that on December 17, 1997, Terri Casey had picked defendant up at a certain location and transported him to another location. When Brown interviewed Casey, Casey did not recall the date of the transportation, but she said that she knew it was the day on which "an Asian woman was killed at a casino." When Brown asked Casey if she knew a woman named Tonica Harris (because defendant had said he was at Harris's house when he called Casey for a ride), Casey replied that defendant had paged her from Harris's house but left before Casey met him.

Tonica Harris testified that defendant came to her house once in December 1997. She was certain that it was a Saturday because she started work at 8:00 a.m. on Saturday mornings and defendant arrived 10 to 20 minutes before she had to leave for work. The trial court took judicial notice that December 17, 1997 (the date of the crimes against Kim) was a Wednesday.

### B. The Penalty Phase

The prosecution presented aggravating evidence regarding defendant's additional acts of violence. Kim's family members gave victim impact testimony.

14

Members of defendant's family and several of his friends presented mitigating evidence.

###### 1. *The prosecution's case in aggravation*

###### a. *Additional acts of violence*

In March 1994, two Los Angeles police officers were on patrol in a marked car when they heard five to seven gunshots. As they turned their car in the direction of the shots, they saw defendant, who appeared to have something in his hands, run across the street into a parking lot. Believing that defendant had fired the shots, the officers pursued him. Defendant tried to scale a fence, but was unable to do so. He then walked to a trash dumpster and discarded something underneath it before trying to hide behind the dumpster. When arrested, defendant gave a false name. Under the dumpster, the officers recovered a loaded .25-caliber semi-automatic handgun. The gunfire the officers had heard earlier was consistent with such a small caliber handgun.

In June 1998, defendant and another inmate, Patrick Griggs, had an altercation at the county jail. After sheriff's deputies separated the two, Griggs said: "That guy has a shank. I'm going to defend myself." A sharpened piece of wood, six and one-half inches long, was found in defendant's waistband. In September 1998, deputies heard a commotion and then saw defendant and Griggs standing face-to-face in a combative stance. Griggs had a bump on the side of his head and scratches on his neck. Defendant's right hand was slightly swollen. In February 1999, a deputy performing a random search for weapons and other contraband searched defendant's single-man cell and found a metal shank underneath his mattress.

15

### b. *Victim impact evidence*

The prosecution introduced the testimony of Kim's husband, Bruce Galbreath, her older sister, Miah Richey, and her younger brother, Han Kim. Each testified about their life with Kim, her qualities, how they learned of the attack on Kim and watched her "hang onto life" for five days in the hospital, and the devastating impact her murder had on their lives. Richey further testified that Kim left behind two school-age children from a previous marriage.

### 2. *The defense's case in mitigation*

Defendant was 22 years old at the time of trial. The defense presented the testimony of defendant's mother, Kimberley Ashley, who gave birth to defendant when she was 14 years old, and his stepfather, Tony Broomfield, who married defendant's mother when defendant was six years old. Defendant's 18-year-old half sister, Irene Broomfield, his second cousin, Billy Ashley, family friend Sylvia Thornton, and two of his friends, 18-year-old Mariah Mack and 16-year-old Bryan Harris, also testified. The witnesses described defendant in positive terms — he was "a very bright young man" who was respectful to his parents, a sweet and caring person who helped family and friends, someone who took care of and bought things for other people's children, a "hard worker" who was "always laughing" and "liked to joke around," and a regular churchgoer who "made good grades in school." None of them knew defendant to be a violent person. All were shocked when they heard of the crimes defendant had been accused of committing. They admitted, however, that they did not know everyone defendant "hung out" with or what he did all the time. Defendant's mother acknowledged that he was expelled from three junior high schools and had wanted her to lie to probation authorities about his being fired from a video store job. But she felt that he did not "deserve to die."

16

## II.  DISCUSSION

### A.  Jury Selection Issues

#### 1.  *Restriction of voir dire*

Defendant claims that the trial court erroneously restricted his counsel's questioning of prospective jurors regarding the charged crimes in violation of his Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution and his rights under the California Constitution.  The claim is without merit.

#### *a.  Background*

Jury selection began on April 5, 1999.  The questioning at issue took place during combined death qualification and general voir dire.

Defense counsel first questioned Prospective Juror No. 6265:  "To get to the second phase of the trial, you'd have to find my client guilty of first degree murder, and allegations of rape, allegations of robbery, on a named victim.  A woman.  Miss Kim.  Then there's another . . . charge to my client, another attempted murder and robbery.  Assuming you found all those things to be true, you get to the penalty phase, you only have two choices:  life without the possibility of parole, or the death penalty. . . .  [Based on] what little bit you know about this case as of right now, what would you say?"  The juror responded, "Not guilty."  Following up, defendant's counsel then asked, "How about in the penalty phase?"

At that point, the trial court conducted a sidebar conference with all counsel, at which it expressed concern about asking prospective jurors "*to prejudge what the potential decision would be* in a death penalty case, based on the allegations alone."  (Italics added.)  The court explained:  "I think it's certainly proper to voir dire as to whether or not they would consider both punishments, as

17

whether or not they predetermine what an appropriate punishment should be. But my concern is that eventually, we're going to now piecemeal it down to what if you found this allegation true, or that allegation true, or guilty on this count, or on that count, *what would your decision then be*." (Italics added.)

Defense counsel agreed it would be improper to ask a prospective juror to prejudge the question of penalty. The trial court added that the only thing the attorneys could do was ask whether or not the prospective juror had an open mind as to either of the possibilities. Defense counsel countered that he believed he could go into "some of the facts of the case" and ask whether, based on these facts, the prospective juror would "automatically vote death, and never consider life without the possibility of parole." The court responded: "I think that you're in treacherous waters . . . . I don't think it's appropriate to ask them to prejudge that. They know what the general allegations are. If you want to say you've heard the general allegations, you know, with those general allegations, in mind, you know, are you in a position where you're automatically going to go one way or the other. But don't break it down. *Don't ask them to prejudge* which factors they would find aggravating or mitigating. I think that's inappropriate." (Italics added.)

Defense counsel then rephrased his question and asked Prospective Juror No. 6265 whether "based on the allegations in this case," if it went to a penalty phase, he would consider both life without the possibility of parole and a death sentence. Prospective Juror No. 6265 responded, "Yes."

Defense counsel later asked Prospective Juror No. 2738, without objection, whether, at the penalty phase of a case involving "robbery, killing of a woman, [and] rape [in which] . . . a woman was put in the trunk of a car alive and burned, and . . . lived for awhile," she could consider both life without the possibility of parole and a death sentence. Prospective Jurors No. 5061 and No. 1589 were asked similar questions. These three prospective jurors each responded that they

18

could consider both life without the possibility of parole and a death sentence. Defense counsel also asked Prospective Juror No. 0985 more generally whether, having heard the questions asked of other prospective jurors, any of his answers would be different, and whether, knowing "a little bit about the case," he would automatically vote for death. Similar questions were asked Prospective Jurors No. 5217 and No. 5061. They replied that they would not automatically vote for death. Defendant's counsel then passed on the jury for cause.

### b. Analysis

The purpose of voir dire is to "aid the exercise of challenges for cause." (Code Civ. Proc., § 223.) "*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188.) The trial court has considerable discretion in "the manner in which voir dire is conducted, including any limitation on the time which will be allowed for direct questioning of prospective jurors by counsel and any determination that a question is not in aid of the exercise of challenges for cause." (Code Civ. Proc., § 223; see *People v. Jenkins* (2000) 22 Cal.4th 900, 990 (*Jenkins*).) "[E]ither party is entitled," however, "to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine a penalty after considering aggravating and mitigating evidence." (*People v. Cash* (2002) 28 Cal.4th 703, 720-721 (*Cash*).)

19

Here the trial court did not abuse its discretion when it limited the questions that defense counsel could ask prospective jurors. At no time did the court prohibit counsel from questioning prospective jurors about facts of the case that were not expressly pleaded in the information. (Compare with *Cash*, *supra*, 28 Cal.4th at pp. 718-722.) To the contrary, defense counsel had ample opportunity to inform prospective jurors of case-specific facts in soliciting their views on capital punishment. Counsel specifically asked prospective jurors whether, assuming defendant was found guilty of the allegations involved in the case — which both the court and counsel described in some detail — they would automatically vote for death or life in prison without the possibility of parole. In *People v. Rich* (1988) 45 Cal.3d 1036, 1104-1105, we held that the defendant's voir dire was not improperly limited when the parties were permitted to ask prospective jurors whether they would be able to consider both penalties if certain facts about the case were proved. Such questioning is appropriate, but asking the prospective jurors to prejudge the penalty phase is not.

### B. Guilt Phase Issues

#### 1. *Sufficiency of the evidence for the arson-murder special circumstance*

Defendant contends there is insufficient evidence to support the arson-murder special circumstance because the arson did not involve an inhabited structure or property. He is correct. The arson-murder special circumstance requires an "[a]rson in violation of subdivision (b) of Section 451." (§ 190.2, subd. (a)(17)(H).) Section 451's subdivision (b) provides: "Arson that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment in the state prison for three, five, or eight years." The term "inhabited" for this purpose means "currently being used for dwelling purposes whether occupied or not." (§ 450, subd. (d).) "The arson special circumstance

20

thus applies only to arson of an inhabited structure or inhabited property." (*People v. Clark* (1990) 50 Cal.3d 583, 606, fn. 13.)

Here, the evidence established that Kim was placed in the trunk of her car and shot several times, after which the car was set on fire. No evidence was presented that the car was used for dwelling purposes. Consequently, as the Attorney General concedes, the arson special-circumstance finding for defendant must be vacated, as was done by the Court of Appeal for codefendants Flagg and Higgins. (See *People v. Flagg*, *supra*, B135685 [nonpub. opn.].)

This does not affect defendant's conviction and sentence for violating section 451's subdivision (a), which requires only that the arson cause great bodily injury, and not that it be of an inhabited structure or property. Nor does it affect the jury's true finding of the robbery-murder special circumstance, which, standing alone, was sufficient to make defendant eligible for the death penalty.

Defendant nevertheless argues that the penalty verdict must be reversed because the jury was told, pursuant to CALJIC No. 8.85, that it could consider the arson-murder special circumstance as a factor in aggravation. As he acknowledges, however, the United States Supreme Court held in *Brown v. Sanders* (2006) 546 U.S. 212 (*Brown*), that an "invalidated sentencing factor" does not "render a death sentence unconstitutional" if "one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." (*Id.* at p. 220.) Included among California's sentencing factors are " '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding.' " (*Id.* at p. 222.)

Here, the jury's consideration of an invalid eligibility factor in the weighing process did not produce constitutional error. All of the facts and circumstances admissible to establish the arson-murder special circumstance "were also properly adduced as aggravating facts bearing upon the 'circumstances of the crime'

21

sentencing factor. They were properly considered whether or not they bore upon the invalidated eligibility factor[].” (*Brown*, *supra*, 546 U.S. at p. 224.) Because the jury was authorized to give aggravating weight to these facts and circumstances, regardless of whether they constituted arson in violation section 451’s subdivision (b), our vacation of the arson-murder special-circumstance finding does not require reversal of the death penalty. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1354.) As in *People v. Mungia* (2008) 44 Cal.4th 1101, 1139, in which we vacated a torture-murder special-circumstance finding, there is no likelihood that the jury’s consideration of the mere existence of the arson-murder special circumstance “tipped the balance toward death.”

Attempting to distinguish his case, defendant argues that *Brown*, *supra*, 546 U.S. 212, involved four special circumstances, two of which were invalid, while his case had only two special circumstances, one of which was invalid. This is a distinction without a difference. The high court in *Brown* did not uphold the jury’s penalty verdict because two special circumstances remained valid, but because the jury was entitled to consider the facts underlying the invalid special circumstances as circumstances of the crimes.

### 2.    *Merger doctrine and the arson-murder special circumstance*

Defendant argues the merger doctrine prohibited application of the arson-murder special circumstance in his case. We need not address this argument in light of our holding that the arson-murder special-circumstance finding must be vacated.

### 3.    *Dismissal of Juror No. 2*

Defendant contends the trial court prejudicially erred in dismissing Juror No. 2 during the trial. We conclude that the trial court did not abuse its discretion

22

in determining that this person could not perform her duties as a juror and discharging her as a result.

### a. Background

On the first day of testimony, the trial court notified counsel in open court, but outside the jury's presence, that the bailiff had reported that a spectator in the courtroom was using a tape recorder. The court asked the spectator to identify herself, and she gave her name as Kimeko Campbell. The court admonished Campbell that audio taping of court proceedings was not allowed unless expressly approved in advance by a judge based on a specific petition for that purpose. When asked if she was "an interested party, friend, or relative, member of the press," Campbell responded she was "just [a] spectator."

A few days later, codefendant Flagg's attorney informed the trial court, again outside the jury's presence, that the previous evening he had learned that Campbell's father was dating one of the jurors and that Campbell was friends with, or had been friends with, Flagg's family. Counsel also said that during the trial, Campbell had been intentionally sitting on the other side of the courtroom from where Flagg's family was seated "because she did not want the jurors to see her around the family, or interacting with them." That morning, Flagg's attorney had asked Campbell if she knew Juror No. 2. Campbell responded that "she may have met her one time a long time ago," but that she did not "know her." Campbell claimed she had not spoken or made eye contact with Juror No. 2 since she had been in the courtroom. In response to further inquiry from counsel, Campbell explained that she was there because she was "writing a story for class about this case." She rejected counsel's request to leave.

The prosecutor said that he recalled Campbell sitting with some of Flagg's family during the preliminary hearing. He asked that Juror No. 2 be removed for

cause because of potential bias arising from the circumstances that Campbell was close to Flagg and her father was dating the juror.

The trial court conducted an in-chambers inquiry of Juror No. 2. When asked whether she recognized anyone in the audience section of the courtroom, Juror No. 2 responded: "Just one person. . . . Her name is Kim. She's doing a project, or something for school." When asked about their relationship, Juror No. 2 said she had been dating Campbell's father for "a little over a year" and saw him "usually every weekend." Campbell did not live with her father and Juror No. 2 did not know Campbell "that well," having only seen her five times, twice at Campbell's father's house and three times in the courtroom since the trial began. She was "shocked" to see Campbell in court. Although Juror No. 2 had not discussed the case with her, she had asked Campbell why she was there. Campbell responded that she was "doing a school project" and had been "following the case since it started." When asked if Campbell's presence or interest in the case would influence her in any way, Juror No. 2 responded, "No. Not at all." She explained that she did not bring Campbell's presence to the court's attention because "I didn't think it really mattered. . . . I know what my part is on this case." The juror added: "I know I am not allowed to talk to her. So it was never an issue, you know, of trying to communicate with her, or her trying to communicate with me."

The trial court then brought Campbell into chambers. When asked whether she knew one of the jurors, Campbell replied: "I don't know her. I saw her once. I've never been introduced to her. I have no idea what her name is. So I've never met her. I just saw her. . . . At my dad's house." She said she did not know what kind of relationship Juror No. 2 had with Campbell's father. Campbell explained that she was interested in the case because she was a self-employed writer, she had never observed a murder trial, and Kim's murder had occurred close to her house.

24

She denied having "a major interest" in the case and said she was not "affiliated with anyone there."

The trial court asked whether Campbell had had any contact with anyone involved in the case — the victims' families, the families of defendant or his codefendants, the attorneys, or law enforcement officers. Campbell responded, "No, I have no involvement whatsoever." She then revised her answer, saying that during the previous year she had met and talked with a girl at the preliminary hearing whose first name was "Tynesha," but she did not know her last name. When asked if she knew why Tynesha was interested in the case, Campbell responded that Tynesha's "boyfriend, or ex-boyfriend" was a defendant. The court inquired whether she had "any relationship with Tynesha as a friend, or anything else," and Campbell finally acknowledged, "Actually she's my niece."

In response to questioning by the defense, Campbell stated that she had not discussed any of the facts of the case with her father and would abide by a court order prohibiting her from discussing the case with him. In response to questioning by the prosecution, Campbell said that Tynesha was her sister's daughter, that she was close to her sister and Tynesha and lived about 15 minutes away from them, and that she spoke to Tynesha frequently.

The trial court then recalled Juror No. 2 into chambers for further questioning. Juror No. 2 said that she did not know anyone named Tynesha. She confirmed that the man she was dating, Ernie Campbell, had only one child, Kimeko, agreeing that "they're close." She said he also had stepchildren, but she did not know how many or what their names were.

After telling Juror No. 2 to assume that Kimeko Campbell was related to a witness who was to testify, the trial court asked, "do you think that would influence you one way or the other?" She responded: "No. It wouldn't. . . . I have only seen Kim twice. And . . . we don't even really speak. . . . I don't know

25

any of the other family.  So whatever goes on here, has no relation to whatever goes on out there, as far as the case. . . .  It doesn't affect me at all, because I don't have any feelings toward any of them except the father."  The court, however, remained doubtful:  "My concern is how the knowledge that potentially there are relationships between Ernie and some of the other people that may be involved, either as witnesses or as defendants . . . .  It's obviously not [a] brother or sister.  It's more remote than that.  But how are you going to feel if you're the person that's responsible for judgment?  . . .  Are you going to feel awkward if you make a decision one way, and it negatively impacts somebody that's involved in this case?  . . .  I need to know whether or not you're comfortable with it, whether or not you're going to be objective in your evaluation, or whether or not you're going to be thinking in the back of your mind . . . this is my boyfriend's . . . stepgranddaughter's boyfriend."  Juror No. 2 replied:  "No . . . I have to let conscience be my guide. . . .  If I were closer to them, maybe, yes, it would bother me.  But I don't even know them.  All I know is Kim, and I only know her just by sight. . . .  They might know me, or might know . . . that I've done this.  But — I'll have to deal with that at a later date . . . after the fact.  And I don't think I will really have to deal with it too much.  I don't think . . . they're going to hold anything against me, whatever decision I make on the case. . . .  They have to understand that this is what had to be done, whatever way it goes."  She added:  "I feel comfortable making the decision."

The prosecutor renewed his request that Juror No. 2 be dismissed.  He argued that Tynesha Coleman, who was on codefendant Flagg's witness list, had been in the courtroom for the majority of the proceedings, had an ongoing relationship with Flagg, and was the mother of his child.  Coleman's aunt, Kimeko Campbell, was "very close" to and the "only natural child" of Ernie Campbell, Juror No. 2's boyfriend.  The prosecutor added that Juror No. 2 was aware, as a

26

result of the court's questioning, that she was being asked "to sit in judgment of . . . someone who is related to someone who she . . . has an ongoing relationship with." The prosecutor argued that these relationships made Juror No. 2's bias "apparent . . . regardless of what she said in camera." Defense counsel argued against the dismissal, asserting that Juror No. 2's answers to the questions of the court and counsel showed that she was unbiased and could be fair.

The trial court expressed concern that Juror No. 2 had not inquired further of Campbell when she saw her in the courtroom and Campbell told her she was writing a paper for school: "Her boyfriend's daughter just happens to pick this trial . . . in order to write a paper . . . . Just going to leave it at that?" The court was also concerned that Juror No. 2 had not brought Campbell's presence to the court's attention and was consciously avoiding eye contact with Campbell, who sat less than 20 feet away from her in the court: "If she didn't think there was anything improper with her being there, why would she not even look at her? Why wouldn't she bring it to the court's attention if she was concerned about it?" The court further expressed doubt that Juror No. 2 truly was "absolutely comfortable" with making a decision adverse to the defense concerning guilt and punishment even if her boyfriend's stepgranddaughter was dating one of the codefendants.

Ultimately, the trial court ruled: "This is not a subjective standard. This is an objective standard, based upon the facts that are produced in this court. . . . The court makes a determination of good cause that the juror is unable to perform her duty as a juror. . . . The mere fact that the juror may indicate that she still feels comfortable is not the end of the discussion, or the end of the question. The question is whether or not the court is satisfied on an objective standard that she can perform her duty as a juror, based upon the relationship [of] this juror and Ms. Campbell, and Ms. Campbell and Tynesha Coleman and the defendant. I'm

not satisfied that this juror can perform her services as a juror. The court finds good cause under Penal Code section 1089. Juror number two is going to be discharged."

The defense then moved for a mistrial, which the court denied. Juror No. 2 was discharged and replaced by an alternate juror.

### b. Analysis

A trial court may discharge a juror at any time, including during deliberations, based on a showing of "good cause" that the juror is "unable to perform his or her duty." (§ 1089.) "When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 (*Barnwell*); *People v. Farnam* (2002) 28 Cal.4th 107, 141.) The ultimate decision to retain or to discharge a juror rests within the court's sound discretion. (*People v. Burgener* (2003) 29 Cal.4th 833, 878.)

"We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality." (*People v. Wilson* (2008) 43 Cal.4th 1, 26.) "The demonstrable reality test entails a more comprehensive and less deferential review" than is typical under the abuse of discretion standard. (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.) "It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion" that the juror was unable to perform his or her duties. (*Id.* at p. 1053.) Although a reviewing court will not reweigh the evidence, we "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Ibid.*) In reaching that conclusion, we "will consider not just the evidence itself, but also the record of reasons the court provides." (*Ibid.*)

Applying these general principles to the circumstances of this case, we conclude that the trial court here did not abuse its discretion in finding good cause to discharge Juror No. 2. The totality of the evidence on which the court relied supports the conclusion that the juror was unable to perform her duties.

As detailed in the record, Juror No. 2 was dismissed because of her relationship with Kimeko Campbell (the daughter of Juror No. 2's long-term boyfriend and also a regular courtroom spectator) and Campbell's relationship with Tynesha Coleman (who was not only Campbell's niece and the stepgranddaughter of Juror No. 2's boyfriend, but also codefendant Flagg's girlfriend, the mother of his child, and a potential defense witness). Upon learning of the relationship between Juror No. 2 and Campbell, the trial court conducted a prompt and thorough investigation to ascertain the extent, nature, and potential effect of their association. The investigation in turn brought to light the connection between Campbell, Coleman, and codefendant Flagg. This intertwining web called into question Juror No. 2's ability to render a fair and unbiased verdict.

After thoroughly questioning Juror No. 2 and Campbell, hearing their responses, and observing their demeanor, the trial court was skeptical of the reason Campbell gave for being in the courtroom. The court also expressed repeated concern that Juror No. 2 had not brought Campbell's presence to the court's attention and that the juror appeared to be consciously avoiding eye contact with Campbell. Lastly, the court was not convinced that Juror No. 2 could make an impartial decision concerning guilt and punishment in light of the just-revealed relationships.

The trial court's concerns regarding the connections among Juror No. 2, Campbell, Coleman, and codefendant Flagg and the lack of forthright and candid disclosure in regards to these connections, was a sufficient basis for the court's

29

determination that Juror No. 2 could not fulfill her duties as a juror. Juror No. 2 was personally, albeit somewhat remotely, connected to a defense witness and one of the codefendants, and the court found that the juror's demeanor and the manner in which these connections were brought to the court's attention suggested that the juror was not being truthful and forthcoming. The court reasonably concluded that these circumstances presented a demonstrable reality that Juror No. 2 could not be a fair and impartial juror, despite her statements to the contrary.

We do not reweigh the evidence to independently determine whether Juror No. 2 was being completely truthful or whether the detailed relationships would affect her ability to carry out her duties as a juror. "Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror . . . ." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175.) It is satisfactory for purposes of our review that the evidence, in light of the entire record, supports the trial court's dismissal of Juror No. 2.

### 4. *Admission of testimony regarding codefendant Higgins's statement identifying defendant*

During the prosecution's direct examination, Willard Lewis testified that he saw defendant and codefendant Higgins arguing with a captive Asian woman, heard a car door or trunk slam shut followed by several gunshots, then saw defendant tucking something into his waistband as Higgins walked away. The prosecutor asked Lewis if he heard the men say anything to each other. Over defense counsel's hearsay objection, Lewis testified that he heard Higgins say, "Come on, Don." Defendant's first name is Donald.

Defendant claims that Lewis's testimony recounting Higgins's out-of-court statement was inadmissible hearsay under state law (see Evid. Code, § 1220), and that its admission also violated his right, under the federal Constitution's Sixth, Eighth, and Fourteenth Amendments, to confront and cross-examine codefendant

30

Higgins, who did not testify (see *Crawford v. Washington* (2004) 541 U.S. 36; *Bruton v. United States* (1968) 391 U.S. 123; *People v. Aranda* (1965) 63 Cal.2d 518).  He argues that admission of the statement was prejudicial error, requiring reversal of the guilt and penalty phase verdicts.

Even assuming the trial court erred in admitting the brief three-word statement, "Come on, Don," the error is harmless under any standard.  (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  It is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error in light of the other evidence overwhelmingly pointing to defendant's involvement in Kim's robbery and murder.  This included (1) eyewitness Lewis's in-court identification of defendant as a participant in the offenses; (2) the surveillance videos that showed defendant monitoring Kim's gambling activities and then following her out of the casino parking lot; (3) the evidence that a less than a week later, defendant similarly followed Dassopoulos from the same casino and then attacked, robbed, and shot her in her garage; (4) defendant's subsequent arrest in the casino parking lot, in the car that had been used to follow Kim and Dassopoulos; and (5) the ballistic evidence showing that the gun in defendant's possession when he was arrested had been used in both the Kim and Dassopoulos shootings.

### 5. Cautionary instruction regarding codefendant Higgins's statement identifying defendant

Defendant contends that the trial court committed prejudicial error by not giving a cautionary instruction to the jury regarding codefendant Higgins's statement, "Come on, Don."  More specifically, he argues the court should, on its own initiative, have instructed the jury that evidence of out-of-court oral admissions must be viewed with caution.  He cites CALJIC Nos. 2.70 and 2.71 as examples of the instruction that should have been given.

31

CALJIC No. 2.70 (6th ed. 1996) provides: "A confession is a statement made by a defendant in which [he] [she] has acknowledged [his] [her] guilt of the crime[s] for which [he] [she] is on trial. In order to constitute a confession, the statement must acknowledge participation in the crime[s] as well as the required [criminal intent] [state of mind]. [¶] An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made a confession [or an admission], and if so, whether that statement is true in whole or in part. [¶] [Evidence of [an oral confession] [or] [an oral admission] of the defendant not made in court should be viewed with caution.]."

CALJIC No. 2.71 (6th ed. 1996) is identical in part. It states: "An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part. [¶] [Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution.]."

Even assuming the trial court erred in omitting a cautionary instruction regarding codefendant Higgins's statement, "Come on, Don," the omission was harmless because it is not reasonably probable the jury would have reached a result more favorable to defendant at the guilt phase had the instruction been given. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) As discussed in part II.B.4, *ante*, other evidence overwhelmingly pointed to defendant's involvement in Kim's robbery and murder.

32

### 6. Instructions regarding robbery-felony-murder rule

Defendant argues the trial court committed prejudicial error in instructing the jury on the law of robbery felony murder, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. We disagree. The court's instruction correctly stated the law, and to the extent a portion of the instruction was inapplicable to this case, any error was harmless.

In discussing with counsel the jury instructions to be given, the trial court proposed giving a modified version of CALJIC No. 8.21.1, as follows: "For the purposes of determining whether an unlawful killing has occurred during the commission or attempted commission of a robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time. [¶] A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property. [¶] A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property. [¶] *A perpetrator has not reached a place of temporary safety if the continued control over the victim places the perpetrator's safety in jeopardy. A perpetrator's safety is in jeopardy if at any unguarded moment, the victim might have managed to escape or signal for help.*" (Addition in italics.) The court noted its reliance on *People v. Carter* (1993) 19 Cal.App.4th 1236, 1251-1253 [upholding a substantively identical instruction], *People v. Stankewitz* (1990) 51 Cal.3d 72, 101 (*Stankewitz*), and *People v. Fields* (1983) 35 Cal.3d 329, 366-368 (*Fields*).

33

Codefendant Flagg's counsel objected to the part of the proposed instruction that read "[l]ikewise, [the robbery] is still in progress so long as the immediate pursuers are attempting to capture the perpetrator or to regain the stolen property," as well as to the final paragraph of the instruction. Defendant's counsel joined in both objections. The trial court overruled the objections and later gave the modified version of CALJIC No. 8.21.1, as set forth above.

The robbery-felony-murder instruction the trial court gave was a correct statement of the law. "[T]he crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place." (*People v. Fierro* (1991) 1 Cal.4th 173, 226.) As a result, the commission of a robbery is ongoing "until the robber has won his way to a place of temporary safety." (*Ibid.*) A robber has not reached a place of temporary safety while an immediate and active pursuit to recover the property is in progress. (*People v. Salas* (1972) 7 Cal.3d 812, 822.) Similarly, as long as a robber holds the victim captive, the robber's safety is "continuously in jeopardy" during the period of captivity if at "any unguarded moment the victim might . . . escape or signal for help." (*Stankewitz, supra*, 51 Cal.3d at p. 101; see *Fields*, *supra*, 35 Cal.3d at p. 364 ["the jury could properly consider that defendant might not have reached a place of temporary safety or attained unchallenged possession of the stolen property when he was still encumbered with [the victim], who at first opportunity might call the police"].)

The instruction did not, as defendant contends, give rise to a mandatory presumption that the commission of a robbery continues so long as the victim is held captive, no matter what period of time has passed. Rather, it correctly told the jury to find that a place of temporary safety had not been reached *if* the robbery victim's continued captivity posed a threat to defendant's safety, and that

34

defendant's safety was in continued jeopardy *if* the captive victim might have escaped or signaled for help during an unguarded moment. The instruction was not argumentative in this regard: It made no reference to specific evidence, and it was phrased so as to emphasize the jury's duty to determine as a matter of fact whether continued control of the victim affected defendant's safety. Accordingly, we reject the challenge to this portion of the instruction.

Defendant is correct that the trial court erred in giving the portion of the instruction regarding pursuers, because there was no evidence that defendant was pursued. (See, e.g., *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 ["It is error to give an instruction that, while correctly stating a principle of law, has no application to the facts of the case."].) "The error of instruction on an inapplicable legal theory is reviewed under the reasonable probability standard of [*Watson*, *supra*, 46 Cal.2d at p. 836]." (*People v. Mills* (2012) 55 Cal.4th 663, 681.) Here, any error was harmless because it is not reasonably probable the jury would have reached a result more favorable to defendant at the guilt phase had the instruction regarding pursuit not been given. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

The critical concept in the robbery-felony-murder instruction is the question of whether the perpetrator has reached a place of temporary safety — as long as that has not occurred, the jury is instructed, the commission of the robbery is ongoing. Here, Kim was held captive before she was killed. Her captivity took place, at least at the end, in full public view on a residential street. Her pleading and arguing with defendant attracted the attention of witnesses who heard the commotion. Defendant's continued control over Kim in this manner placed his safety in jeopardy. In light of this evidence, even if the pursuit portion of the instruction had been omitted, a reasonable jury would have concluded that defendant had not reached a place of temporary safety and that the commission of the robbery was not complete until Kim was placed in the trunk of her car, shot,

35

and set on fire, thus placing the acts that caused her death squarely within the parameters of the robbery-felony-murder rule.

### 7. *Cumulative effect of guilt phase errors*

Defendant urges that in combination, the various guilt phase errors he alleges caused cumulative prejudice warranting reversal of the guilt verdict. We have found that the arson-murder special circumstance must be vacated, and that the trial court erred in giving the portion of the robbery-murder instruction regarding pursuers. We have also concluded that any presumed error in admitting codefendant Higgins's statement, "Come on, Don" or in omitting a cautionary instruction regarding the statement was harmless because other evidence overwhelmingly pointed to defendant's involvement in Kim's robbery and murder. We further find that the limited errors and presumed errors had no cumulative prejudicial effect.

## C. Penalty Phase Issues

### 1. *Jury's question regarding the consequences of failure to reach a penalty phase verdict*

On June 2, 1999, during the penalty phase deliberations, the jury sent the trial court a note asking: "If the jury deadlocks on the verdicts and penalty phase, what would happen? Would (1) the defendant[s] be tried all over again? (2) Would defendant[s] be tried over again in penalty phase only with different jury? (3) Would defendants get the lesser degree sentence automatically of life without possibility of parole?" After discussion with counsel, the court proposed responding to the jury in writing as follows: "This is not an appropriate factor for your consideration. You are ordered to disregard this consideration. The court

36

cannot answer this question." All counsel agreed with the proposed response, which the court then gave.

Defendant now contends that the trial court erred in not answering the jury's questions. Defense counsel waived this claim by affirmatively agreeing with the court's actions. (See, e.g., *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 (*Rodrigues*) [similar claim of error waived "[i]nasmuch as defendant both suggested and consented to the responses given by the court" to jury's inquiries].)

Anticipating this outcome, defendant argues that the trial court had a duty under section 1138[3] to adequately answer, on its own initiative, the jury's questions and that the failure to do so violated state law as well as defendant's Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution. The court, however, did adequately answer the jury's questions when it told the jury that the inquiry was not a proper consideration for the jury's deliberations. We have previously held that a trial court is not required to tell the jury of the legal consequences in the event of a possible deadlock. (*Rodrigues*, *supra*, 8 Cal.4th at p. 1193.) This is because an instruction setting forth the consequences of a hung jury "would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process." (*People v. Belmontes* (1988) 45 Cal.3d 744, 814.) "Penalty phase juries are presently instructed that their proper task is to decide between a sentence of death and life without the possibility of parole. Any further instruction along the

---

[3] Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

lines suggested herein [i.e., informing the jury of the possibility of subsequent retrials in the event of a deadlock] could well serve to lessen or diminish that obligation in the jurors' eyes." (*Ibid*.; see *People v. Gurule* (2002) 28 Cal.4th 557, 648 [same]; *Rodrigues*, *supra*, 8 Cal.4th at p. 1193 [same]; *People v. Waidla* (2000) 22 Cal.4th 690, 746 [as a general matter, some instruction is permissible but is not required].)

### 2. *Denial of motion for mistrial when jury indicated it was deadlocked*

Defendant claims that by insisting on further deliberations and refusing to declare a mistrial after the penalty jury initially declared it was deadlocked, the trial court violated his rights under state law as well as his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. This claim lacks merit.

### a. *Background*

After further deliberations following the jury's question and the trial court's response described in part II.C.1, *ante*, the court informed counsel that the jury foreperson had told the bailiff that the jury was deadlocked. The prosecutor expressed the view that the jury had not yet had sufficient opportunity to deliberate. Defense counsel disagreed, noting that the jury had deliberated for several days at the guilt phase and that, by the time the penalty phase started, most of the jurors had probably made up their minds. The court responded it would have the jury brought into the courtroom, observing that the amount of time the jurors had spent deliberating in the penalty phase as to the three defendants — a day and a half — did not appear sufficient to declare a mistrial, given the length of the trial — two months.

When the jury came into the courtroom, the trial court asked it how many votes had been taken. The foreperson replied that about five ballots had been

taken as to defendant, about five as to codefendant Flagg, and one as to codefendant Higgins. He added that as to defendant, there had been no changes in the vote in the last two ballots, and that he did not believe that further deliberations, rereading of the jury instructions or the testimony, clarification of the instructions, or review of the exhibits would help the jury reach a verdict. The 12 jurors were then polled individually as to whether rereading of the jury instructions or the testimony, or review of the exhibits would assist them in reaching a unanimous verdict. Each answered in the negative.

Outside the jury's presence, defendant's counsel moved for a mistrial. The trial court noted that the jurors were "tired" and "frustrated" but in light of the lengthy trial and the limited penalty phase deliberations, the court declared a recess for the afternoon to give the jury "a break." After calling the jury back in, the court ordered the jurors to come back the next morning to continue deliberations "when you're fresh," adding that "if it's apparent to you after a period of time that those discussions are fruitless, and there's nothing else that the court is going to be able to do to assist you in reaching a decision, then so be it." Late the next afternoon, the jury reached unanimous verdicts as to all three defendants.

### b. Analysis

Defendant argues that section 1140 required the trial court to discharge the jury and declare a mistrial when the jurors initially declared themselves deadlocked. Section 1140 allows a trial court to discharge a jury and declare a mistrial if the court determines that the proper period of time for deliberation has expired and "there is no reasonable probability" that the jurors can agree on a verdict. The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion. (*People v. Bell* (2007) 40

39

Cal.4th 582, 616 (*Bell*); *People v. Proctor* (1992) 4 Cal.4th 499, 539; *People v. Rodriguez* (1986) 42 Cal.3d 730, 775.)  "Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived ' "as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." ' " (*Proctor*, *supra*, 4 Cal.4th at p. 539.)

Here, the trial court did not abuse its discretion in declaring an afternoon recess and ordering the jurors to return the next morning to continue their deliberations.  There was nothing coercive about the court's actions.  The court's main concern was that the jury had not deliberated for a sufficient amount of time in light of the length of the trial.  The court did not urge the jury to reach an agreement, nor did it pressure the jury to secure a verdict.  The court simply told the jury that if after an additional period of time it found further discussions fruitless and there was nothing else the court could do to assist the jury in reaching a decision, "then so be it."  In *People v. Cook* (2006) 39 Cal.4th 566, 615, we held that the trial court did not abuse its discretion when it ordered a deadlocked jury, which had deliberated for a day and a half, to continue deliberating for the afternoon, telling the jurors to " 'try your best' " and " 'if you can't [reach a verdict], you can't.' "  Here, the jury's continuation of its deliberations the next day after the afternoon recess suggested "that it had overcome whatever impasse it had reached" in its previous deliberations.  (*Id.* at p.  616.)

Moreover, here the jury had only been deliberating for a day and a half *as to three defendants*, after a trial that had lasted two months.  We have previously upheld the denial of a mistrial in similar circumstances.  (See *Bell*, *supra*, 40

40

Cal.4th at p. 617 [jury had deliberated less than two full days, around 10 hours, after a month and a half of trial].)

Defendant asserts that the trial court erred in not inquiring into the jury's numerical division. He fails to cite, however, any authority requiring such an inquiry. Although we have expressly approved of inquiring into a jury's numerical division in the event of a deadlock (see, e.g., *People v. Breaux* (1991) 1 Cal.4th 281, 319), we have never held this to be mandatory.

Defendant argues that ordering the jurors to come back the morning after the afternoon recess to continue deliberations may have been coercive if there were only one or two holdout jurors. As the numerical division of the jury was not announced in open court, it cannot be said that ordering the jury to return the next day had a potentially coercive effect on holdout jurors. Moreover, the jury was given the option of returning the next day and informing the court it was still deadlocked.

Relying on *U.S. v. Mason* (9th Cir. 1981) 658 F.2d 1263, and other intermediate federal appellate cases, defendant argues that his constitutional rights were violated because the trial court was required to but did not remind the jurors of their duty not to surrender conscientiously held beliefs simply to secure a verdict. Not so. The federal courts require such an admonition if the trial court gives the jury an "*Allen* charge" (*Allen v. United States* (1896) 164 U.S. 492) — "the generic name for a class of supplemental jury instructions given when jurors are apparently deadlocked" that stresses "the importance of securing a verdict" and asks "jurors to reconsider potentially unreasonable positions" — to counterbalance the excesses of that charge. (*Mason* at p. 1265, fn. 1; *id.* at pp. 1267-1268 [noting that the *Allen* charge " 'stands at the brink of impermissible coercion' "]; see also *U.S. v. Beattie* (9th Cir. 1980) 613 F.2d 762, 765.) No *Allen* charge was given here.

41

Lastly, defendant relies on *Quang Duck v. United States* (9th Cir. 1923) 293 F. 563, to argue here that requiring the jury to continue deliberations impliedly communicated the trial court's desire for a unanimous verdict. *Quang Duck* is inapposite. The trial judge there told the jury that he did not " 'understand . . . why a verdict [had] not been promptly rendered' " and that he hoped the jurors would " 'compose [their] differences' " because, in his view, " '[t]here ought to be a verdict reached in this case.' " (*Id.* at p. 564.) The court made no similar comments to the jury in this case. Rather, as noted at page 39, *ante*, it explicitly left open the possibility that the jurors might not reach a verdict when they reconvened for deliberations the following morning.

### 3. Claim of prosecutorial misconduct

Defendant asserts that the trial court erred in not declaring a mistrial based upon alleged prosecutorial misconduct. Because the prosecutor committed no misconduct, the court necessarily did not err in denying defendant's motion for a mistrial.

"A prosecutor commits reversible misconduct under California law if he or she makes use of 'deceptive or reprehensible methods' in attempting to persuade either the trial court or the jury, and there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights — such as the denial that ensues from a comment upon the defendant's invocation of the right to remain silent — but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citation.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 190.)

Here, in its opening statement to the jury at the beginning of the penalty phase, the prosecution outlined the various acts in aggravation that it intended to prove, adding that in its view, the factors in aggravation would substantially outweigh those in mitigation. The prosecution then told the jury: "[A]fter you decide that all these factors in aggravation substantially outweigh factors in mitigation, the jury will then have the opportunity to then find a verdict of death. [¶] And each of you will have to make that decision. And then you will have to make that decision collectively. *And in making that decision collectively, you will be acting as a conscience of the community.*" (Italics added.) Counsel for codefendant Flagg objected, and the trial court sustained the objection. Later, codefendant Flagg's counsel moved for a mistrial, and defendant's counsel joined in the motion. The trial court denied the motion, but invited defense counsel to propose additional or admonishing instructions on the matter if they wished to do so. No such proposed instructions appear in the record.

Defendant argues that the prosecution committed prejudicial misconduct by describing the jury as the "conscience of the community" and that the trial court therefore erred when it denied the mistrial motion. We disagree. The prosecution's comment accurately described the jury's role at the penalty phase. As the United States Supreme Court stated in *Witherspoon v. Illinois* (1968) 391 U.S. 510, 519, "a jury that must choose between life imprisonment and capital punishment can do little more — and must do nothing less — than express the conscience of the community on the ultimate question of life or death." (See *Caldwell v. Mississippi* (1985) 472 U.S. 320, 333 [the "capital sentencing jury" is called upon to decide the issue of punishment "on behalf of the community"].) The prosecutor's brief mention of this role was not improper. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1178; *People v. Ledesma* (2006) 39 Cal.4th 641, 741.)

*4.    Claim of defendant's death sentence being disproportionate to codefendants' sentences of life without the possibility of parole*

Defendant contends that his death sentence is inconsistent with, and disproportionate to, the sentences of codefendants Flagg and Higgins, because they each received sentences of life without the possibility of parole despite having, according to defendant, "far worse aggravating factors" than he had.  As a result, he argues, his death sentence violated the Eighth and Fourteenth Amendments to the federal Constitution.  Not so.  "As we have explained, '[p]roperly understood, intracase proportionality review is "an examination of whether [a] defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others." ' " (*People v. Thomas* (2012) 54 Cal.4th 908, 940-941 (*Thomas*).)  Here, defendant's death sentence is proportionate to his individual involvement and culpability.  Coupled with the circumstances of the crimes, the evidence strongly points to defendant as the shooter of Kim; furthermore, less than a week later, defendant, acting alone, viciously attacked, robbed, and shot a second victim, Dassopoulos, in the head at point-blank range.  It moreover is reasonable to infer that because defendant was the only one involved in both incidents, he planned and orchestrated them.

*5.    Challenges to California's death penalty scheme*

Defendant challenges the constitutionality of California's death penalty scheme, based on the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  As he acknowledges, however, we have in previous discussions rejected similar claims.  Petitioner has presented no reasons that would compel reconsideration.

We have held that section 190.2 is not impermissibly overbroad.  Specifically, the special circumstances are not so numerous that they fail to perform the constitutionally required narrowing function, and they are neither

44

unduly broad nor unduly expansive, either on their face or as interpreted by this court.  (See, e.g., *Jenkins*, *supra*, 22 Cal.4th at p. 1050; see also *Brown*, *supra*, 546 U.S. at p. 221 [recognizing that the special circumstances listed in section 190.2 satisfy the narrowing requirement].)

As to section 190.3's factor (a), it does not, on its face or as interpreted and applied, permit arbitrary and capricious imposition of a sentence of death.  (See, e.g., *People v. Brasure* (2008) 42 Cal.4th 1037, 1066; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 (*Tuilaepa*) ["The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence."].)

We have held that neither the federal nor the state Constitution requires the penalty phase jury, before imposing a sentence of death, to (1) make unanimous findings concerning the presence of a particular aggravating circumstance; (2) find the truth of, and every fact supporting, one or more aggravating factors beyond a reasonable doubt; or (3) find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that death is the appropriate penalty.  (See, e.g., *Thomas*, *supra*, 54 Cal.4th at p. 949; *People v. Howard* (2008) 42 Cal.4th 1000, 1031; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255.)  The United States Supreme Court's decisions interpreting the Sixth Amendment's jury trial guarantee (see *Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2002) 530 U.S. 466, 530 U.S. 466) do not alter our conclusions.  (See, e.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1249 & fn. 22).

Also, written or other specific findings by the jury regarding aggravating factors are not constitutionally required.  (See, e.g., *People v. Friend* (2009) 47

Cal.4th 1, 90.) There is no constitutional requirement that California's death penalty sentencing scheme provide for intercase proportionality review. (See, e.g., *People v. Moon* (2005) 37 Cal.4th 1, 48; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50-51 [the federal Constitution does not require state courts to conduct intercase proportionality review in the administration of the death penalty].)

With respect to the introduction of unadjudicated evidence under section 190.3's factor (b), we have held that this does not offend the state or the federal Constitution. (See, e.g., *People v. Williams* (2008) 43 Cal.4th 584, 649; *People v. Abilez* (2007) 41 Cal.4th 472, 534; see also *Tuilaepa*, *supra*, 512 U.S. at p. 976.)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. (See, e.g., *People v. Cruz* (2008) 44 Cal.4th 636, 681.)

We have in the past rejected the argument that the use of capital punishment "as regular punishment" violates international norms of humanity and decency and hence violates the Eighth and Fourteenth Amendments of the United States Constitution. We have explained: "California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. [Citations.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43-44.)

Defendant here contends that, although this court has already rejected each of the challenges he now raises, we have not considered the cumulative impact of these alleged defects on California's sentencing scheme as a whole. As, however, California's death penalty scheme is not faulty in any of the respects described by defendant and none of the proposed safeguards for those alleged defects are

46

constitutionally required, no constitutional violation appears even when the alleged defects are considered collectively. (See *People v. Lucero* (2000) 23 Cal.4th 692, 741.)

### 6. *Cumulative effect of the guilt and penalty phase errors*

Defendant argues that the multiple errors that allegedly occurred at the guilt and penalty phases, even if not individually sufficient to warrant reversal of the death sentence, cumulatively compel reversal. We have previously rejected defendant's claim that the errors that we found or assumed to exist for argument's sake were cumulatively prejudicial at the guilt phase. (See pt. II.B.7, *ante*.) We also found the only penalty phase error — the jury's consideration of the invalid arson-murder special circumstance in the weighing process — to be harmless. (See pt. II.B.1, *ante*.) Even if considered cumulatively, these errors do not require reversal of the judgment.

## III. DISPOSITION

For the reasons given above, we vacate the arson-murder special-circumstance finding, and otherwise affirm the judgment in its entirety.


KENNARD, J.*


WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

---

\* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Debose
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S080837
**Date Filed:** June 5, 2014
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** James R. Brandlin

_____

**Counsel:**

Richard P. Siref, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard P. Siref
250 E. Main Street, 8th Floor
El Cajon, CA 92020-3941
(619) 441-6639

David A. Wildman
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2359