Filed 8/27/14  P. v. Wilson CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DARRYL L. WILSON,<br><br>    Defendant and Appellant. | 2d Crim. No. B249423<br>(Super. Ct. No. BA397164-05)<br>(Los Angeles County) |

Darryl L. Wilson appeals a judgment following conviction of burglary and misdemeanor resisting a police officer, with a finding of a prior serious felony strike conviction.  (Pen. Code, §§ 459, 148, 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)[1]  We affirm.

*FACTS AND PROCEDURAL HISTORY*

In the afternoon of April 30, 2012, Maria Buffington returned to her residence on West 80th Street in Los Angeles to find the front door open and "splintered," and the contents of drawers and closets strewn about the house.  A video game console and other personal items were missing.

Earlier, a neighbor saw a gray-colored automobile containing two women and three men stop in front of the Buffington residence.  A woman and three men left the automobile and approached the front door.  The neighbor later saw the men in

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

Buffington's yard and then one man leaving through the front door. The neighbor took photographs of the men and the automobile, noted the automobile's license plate number, and telephoned for police assistance.

Shortly thereafter, Los Angeles police officers stopped the gray-colored automobile. Three of its passengers fled, including Wilson. An officer forcibly arrested him about a block away. Officers later found Buffington's personal property in the trunk of the automobile.

The jury convicted Wilson of burglary and misdemeanor resisting a police officer, but found that a charged criminal street gang allegation was not true. (§§ 459, 148, 186.22, subd. (b)(1)(B).) In a separate hearing, Wilson admitted suffering a prior serious felony strike conviction. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).) The trial court sentenced him to an eight-year prison term for the burglary, consisting of a doubled four-year midterm, plus a six-month sentence for resisting a police officer, to be served concurrently to the prison term. The court also imposed a $240 restitution fine, a $240 parole revocation restitution fine, a $40 court security assessment, and a $30 criminal conviction assessment. (§§ 1202.4, subd. (b), 1202.45, 1465.8, subd. (a); Gov. Code, § 70373.) It awarded Wilson 805 days of presentence custody credit.

Wilson appeals and challenges the trial court's decision to retain Juror No. 6.

*Proceedings Regarding Juror No. 6*

During trial, Juror No. 6 informed the courtroom bailiff that her sister was a recent burglary victim and that she was concerned regarding her ability to be a fair juror. In response, the trial court held a hearing regarding Juror No. 6, as well as three other jurors to whom Juror No. 6 had related the burglary. The four jurors provided these responses to the court's questions:

While in the courthouse restroom the previous day, Juror No. 6 received telephone news of her sister's burglary. She responded with expletives and stated that she could not "believe [her sister] was burglarized." Juror No. 6 added that she was "here on a burglary case and [her] sister was just burglarized."

2

Juror No. 6 stated that other jurors and a family member of one of the defendants heard her telephone conversation. She believed that her statements were "not appropriate" and that she "shouldn't have said anything at all but . . . was so shocked and upset."

Juror No. 6 stated that she now was "okay" and "better than [she] was yesterday." She added that she "should be okay" and could set aside the incident with her sister; she was "still upset," but was "a logical human being." Juror No. 6 did not think that the incident would affect her ability to be fair because she knew that "nobody here was at [her] sister's house." She added that she "was definitely upset" by the incident but that her sister lived in the Palm Springs area and she (Juror No. 6) could not help her.

Codefendant's counsel inquired whether he should "be worried about [her] tainting the jury?" Juror No. 6 responded: "Probably. . . . [I]t's hard to say." She continued that she was "a logical person," who had been "listening to testimony."

The trial court then questioned Jurors Nos. 3, 4, and 5.

Juror No. 3 heard Juror No. 6 curse and state that her sister's home had been burglarized. Juror No. 6 seemed "very, very emotional," and stated that she was unsure if she could be a fair juror given her sister's burglary. Juror No. 3 affirmed that she (Juror No. 3) could be fair and would not be affected by the incident.

Juror No. 4 heard expletives and Juror No. 6 state that her sister was a burglary victim. In a brief conversation with Juror No. 6, Juror No. 4 learned that jewelry and "a lot of . . . stuff was taken." Juror No. 4 stated that the incident would not affect her (Juror No. 4's) ability to be fair and added that, as she stated in voir dire, she had been burglarized twice.

Juror No. 5 heard Juror No. 6 state that her sister's home was burglarized and the burglars took "some expensive stuff, some jewelry." Juror No. 5 tried "to calm [Juror No. 6] down." Juror No. 5 stated that she (Juror No. 5) would "not at all" be affected by her conversation with Juror No. 6.

Following inquiry by the trial court and counsel, a codefendant requested that the court remove Juror No. 6 because she was "emotional." Wilson and the

3

remaining codefendants joined in the request. The trial judge denied the request, stating: "Well, she clearly was emotional yesterday. She indicated that she was, and apparently all of the three other jurors indicated that she was . . . . But she's stated today that she's had the opportunity to calm down and -- and will be able to proceed intelligently, logically, and fairly. So I don't think that cause has been established for Juror No. 6 to be excused."

*DISCUSSION*

Wilson argues that the trial court abused its discretion by retaining Juror No. 6, because her equivocal responses, as well as the responses of Jurors Nos. 3, 4, and 5, reveal a substantial likelihood of her actual bias. He characterizes Juror No. 6 as "beset by emotional turmoil" and "emotionally unstable" and points out that she did not *specifically* state she would be unbiased. Wilson suggests that the court was unconcerned with his constitutional rights, pointing to the trial judge's comment that his Hawaiian vacation was upcoming. He asserts that the error violates his federal and California constitutional rights to an impartial jury and to due process of law. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) Wilson adds that the presence of a biased juror is a structural trial error that is not amenable to a harmless error analysis. (*People v. Nesler* (1997) 16 Cal.4th 561, 579 ["[A] biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard"].)

A trial court may discharge a juror at any time, including during deliberations, upon a showing of "good cause" that the juror is unable to perform his duty. (§ 1089; *People v. Debose* (2014) 59 Cal.4th 177, 200.) Section 1089 provides: "If at any time . . . a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ." The decision to retain or discharge a juror rests within the court's discretion. (*Ibid.*) On review, we defer to the court's decision and affirm unless the decision is unreasonable. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1237; *People v. Martinez* (2010) 47

4

Cal.4th 911, 943 [reviewing court will uphold trial court's exercise of discretion regarding retention of juror if supported by substantial evidence].)

Specifically, as concerns a decision to discharge a juror, the record must support the juror's disqualification as a "'demonstrable reality.'" (*People v. Debose*, *supra*, 59 Cal.4th 177, 200-201.) The "demonstrable reality" test requires a showing that the trial court relied upon evidence, in light of the entire record, that the juror was unable to perform his duties. (*Id.* at p. 201.) The reviewing court does not reweigh the evidence but will review the court's decision for sufficient evidence. (*Ibid.*)

As a general rule, the trial court is "'in the best position'" to assess the state of mind of a juror because it has the opportunity to observe and listen to the juror. (*People v. Debose*, *supra*, 59 Cal.4th 177, 202.) Thus, the court observes and speaks with the juror, hears his responses, including the tone of voice, level of confidence, and demeanor -- valuable information that does not appear in the appellate record. (*People v. Solomon* (2010) 49 Cal.4th 792, 830 [challenge to prospective juror].)

The trial court did not abuse its discretion by retaining Juror No. 6. During questioning, she acknowledged that her restroom outburst was inappropriate and she was concerned that she may have affected other jurors. Juror No. 6 informed the court that she was "okay" and "better." She responded affirmatively to the question whether she could set aside the incident and listen to and decide the present burglary: "I'm still upset, but I'm a logical human being, and so I do believe so." The court observed her demeanor and heard the tone of her responses and the confidence with which she answered. (*People v. Solomon, supra,* 49 Cal.4th 792, 830.)

When counsel inquired whether her sister's burglary would affect her, Juror No. 6 responded: "I don't think so. . . . I know that nobody here was at my sister's house, and so I've been listening to testimony. I don't think so." Juror No. 6 responded to the questions posed by the trial court and counsel in a thoughtful, logical, and non-emotional manner. She also specifically stated that she was listening to the evidence presented at trial and she knew that the defendants were not involved in her sister's burglary. The

court properly decided that there was no substantial likelihood that Juror No. 6 was biased due to her sister's burglary.

Moreover, when counsel inquired whether Juror No. 6 thought counsel would "be worried about [her] tainting the jury," she responded: "Probably. I mean, it's hard to say. I mean, I'm a logical person. I've been in court. I've seen [and] I'm listening to testimony." Her answer was an honest and literal answer to his question. (*People v. Harris* (2013) 57 Cal.4th 804, 855 [trial court acted properly in not dismissing juror who stated that she understood why counsel might think she was biased].)

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.


We concur:


YEGAN, J.


PERREN, J.

6

Craig Richman, Judge

Superior Court County of Los Angeles

_____

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven E. Mercer, Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.