Filed 7/15/15  P. v. Park CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059612 |
| v. | (Super.Ct.No. SWF1201991) |
| NORMAN ANDREW PARK, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Albert J. Wojcik, Judge.

Affirmed.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant and appellant, Norman Andrew Park, owned certain residential property in Lake Elsinore.  The property was the subject of structure abatement proceedings by the City of Lake Elsinore (City).  After a confrontation between defendant and several code enforcement officers in September 2012, defendant was charged with brandishing a firearm in a rude, angry, or threatening manner (count 2; Pen. Code, § 417, subd. (a)(2)),[1] and resisting arrest (count 3; § 148, subd. (a)(1)).

Three months later, defendant met with William Belvin, a City building department official, who told him the property would be demolished.  Defendant became upset and told Belvin that when they come to demolish the property, they should bring a body bag or body bags.  He was charged with threatening a public employee.  (Count 1; § 71.)

After the jury began deliberating, the trial court removed two jurors—Nos. 2 and 12—and replaced them with alternate jurors.  Juror No. 2 was removed because of derogatory comments she allegedly made about City employees at the beginning of deliberations and her evasive answers to the court's questions.

The reconstituted jury found defendant guilty of threatening a public employee (count 1) and not guilty on the two counts arising from the September 2012 altercation.  Defendant was placed on probation for three years and ordered to serve 180 days in custody.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends the trial court erred and violated his constitutional rights to due process and a fair trial by dismissing Juror No. 2. We reject the argument and affirm the judgment.

## II. FACTUAL SUMMARY

A. *Summary of Evidence at Trial*

In June 2010, defendant purchased property in Lake Elsinore that was the subject of a pending structure abatement proceeding. He intended to rehabilitate the property and live there when he retired. A City official told defendant he would have two years to get the property "up to code."

Two years later, in July 2012, the City served a notice of abatement.

On September 10, 2012, three City code enforcement officers went to the property to post a second notice of abatement, indicating the City's intent to demolish the property. When they arrived, there were two people on the property with defendant's permission. The code enforcement officers then entered the property to conduct an inspection.

While the officers were on the property, defendant arrived. Defendant was angry and yelled at the officers to get off his property. He had a revolver in his hand and was loading or unloading the chamber. A code enforcement officer told defendant to put the weapon down, but defendant did not comply. The officers subdued defendant using pepper spray and took his gun.

3

Three months later, defendant was attempting to sell the property. According to defendant, prospective purchasers wanted to meet with Belvin, the head of the City's building department, but Belvin refused to meet with them. As a result, the sale did not go through. Defendant then made an appointment to meet with Belvin.

When they met at the Lake Elsinore City Hall on December 17, 2012, Belvin informed defendant that the property would not be sold, and the City was going to demolish the property. According to Belvin, defendant said, "'Fuck you, we're gonna do it my way.'" Belvin responded that they were going to "do it the [C]ity's way," and that he would "bring the sheriffs." Defendant then turned to leave and, as he walked out, told Belvin to "'[b]ring lots of body bags.'"

On cross-examination, Belvin admitted that he had testified at the preliminary hearing that defendant said, "Bring a body bag," singular.

Defendant testified he told Belvin "to bring a body bag," and explained that he was referring to a body bag for *his* body, because they would not take him from the house alive.

The interaction between Belvin and defendant was witnessed by two other City employees—a secretary for code enforcement officers and a City planning technician. They generally corroborated Belvin's testimony about the interaction and testified that defendant said "body bags," plural.

4

B. *Facts Regarding Dismissal of Jurors*

    1. <u>Juror No. 2's Initial Discussion With the Court</u>

On the second day of deliberations, Juror No. 2 requested to speak with the court. In the court's chambers and with counsel present, she initially informed the court that she was concerned because the jury "didn't even go over the jury instructions" and was "already making decisions on the different counts." The court replied that the jury did not have to review the instructions because the court had read them to the jury.

Juror No. 2 then said that she and Juror No. 12 "don't get along at all." She added that she "strongly believe[s Juror No. 12] made up his mind before he walked into the deliberation room" and that "the defendant is not going to get a fair trial if this juror remains in the deliberations." She said "it's almost like [Juror No. 12] had an agenda, that he's determined, okay, this guy is going to be guilty, period. In other words, he's not willing to listen to the actual facts, and he's not willing to give the defendant the benefit of the doubt." She also described Juror No. 12 as "condescending" and "annoying."

The court indicated to Juror No. 2 that Juror No. 12 "might be a total jerk. . . . But being a total jerk does not disqualify him as a juror . . . ." Juror No. 2 then volunteered that she is "very open and honest," "was raised to . . . always do the right thing," and "take[s] this very seriously."

Juror No. 2 indicated that the jury had reached a verdict, but that she did not "feel good about it." The court cautioned her not to say which way the vote went. She explained that the vote was initially 10 to 2, then changed to 11 to 1, with her as the lone

dissenter. She eventually voted with the others, making it 12 to 0. However, she told the court she had doubts about her vote and would, if given another chance, vote differently. Although she did not say so explicitly, it is apparent from her comments that the vote had been in favor of guilt.

The problem for Juror No. 2, it appeared, was how to interpret defendant's body bag—or bags—comment. She did not view the comment "as a threat because it's too vague. There's too many possibilities. There's too many different ways to look at it. I don't see it as the threat." She said she expressed these concerns to the other jurors during deliberations.

After Juror No. 2 returned to the jury room, the court told counsel: "If this lady [Juror No. 2] stays on the jury, it's going to be hung, which is okay. But it appears like that. This lady was all over the place. She didn't say anything at all that leads me to believe that Juror No. 12 had his mind made up. . . . [¶] . . . [¶] . . . I know the defense would not want me to excuse her. I don't know if there's any grounds really to excuse her. She hasn't expressed to me anything that leads me to believe anything that [Juror] No. 12 should be excused, as well."

2. The Court's Initial Examination of the Jury Foreman

The court then examined the jury foreman, Juror No. 4. The foreman disclosed that there is discord between Juror No. 2 and Juror No. 12. In his opinion, the two have a "personality conflict"—Juror No. 12 is "stubborn" and Juror No. 2 is "oversensitive."

6

The foreman explained that Juror No. 12 is "pretty much set on not listening to the rest" of the jurors, and was not sure whether Juror No. 12 was "able to fulfill [his] oath or duty." By contrast, he thought Juror No. 2 was "open" and "willing to listen" and could fulfill her responsibilities if Juror No. 12 was not part of the group. After further questioning, the foreman stated that Juror No. 2 is "willing [t]o give her best effort," that she "would be more than willing to listen to clarification" of the law, and that "she participates, she listens."

After the foreman left the room, the court commented to counsel: "I believed him. Very upfront. He was pointing the finger at [Juror] No. 12, not at all at [Juror] No. 2."

### 3. The Court's Examination of Juror No. 12

The court then brought in Juror No. 12, who told the court the following: "The moment [Juror No. 2] sat down she said she'd like to share something with us. That living in the Lake Elsinore area, she had had friends who have had dealings with—not . . . Belvin . . . in particular, but other people of his general standing. And they've had hard times with him as well. So, therefore, it is a safe assumption—and this is me summing up her argument—that they're probably all like that. They're all getting in the way and messing with people for a power trip or because they can." He said her "story" went on for 10 minutes.

Juror No. 12 believed Juror No. 2 was biased, and explained: "You don't walk into a jury room and say, 'All Lake Elsinore employees are jerks based off of my friend's

experience,' and then spend the next hour beating around the bush until you finally admit, 'I just don't think this guy is being truthful and the other two employees are on the take.'"

After Juror No. 12 left the room, the court commented that the jury foreman was "the most credible." The court stated that Juror No. 12 ought to be replaced, and expressed the following regarding Juror No. 2: "What bothers me about [Juror] No. 2 is if she walked in there and said, 'All Lake Elsinore employees, based upon my friend, are jerks; people like Belvin, they're all alike,' or something along those lines, that gives me a problem as well." The court added: "[I]f she came in with a bias by saying they're all jerks, I think that's a problem. That is a bias, because . . . all the primary witnesses worked for Lake Elsinore, and Belvin, in particular. And then you had the two females who came in to testify. If it appeared she made that statement, I think that's an innate bias and I would excuse her." The "two females" is a reference to the two City employees who corroborated Belvin's testimony that defendant said the plural, "body bags."

4. The Court's Second Examination of Juror No. 2

Juror No. 2 was brought back into the court's chambers. The court asked whether she or her friends have had dealings with City code enforcement. She indicated she had heard complaints from people about getting traffic tickets from code enforcement. She also said that when she was constructing a pool on her property, she had been told that getting a building permit from the county is better than getting one from the City because of smaller fees and fewer hassles.

8

When asked whether she made any statement during deliberations that City employees were jerks, she initially said that she could not recall, and later denied doing so. When the court asked if she made any derogatory statements to the other jurors, she responded: "That's derogatory? I just don't think they're very smart." The court asked if she commented to the other jurors that the employees are not smart. She responded: "I probably said something like—well, I can't remember my exact words, but I might have said something like, 'Lake Elsinore employees'—I hardly ever deal with Lake Elsinore employees. I'm trying to think when have I had an experience." She added: "I don't remember saying that, so how could I come up with something like that?"

The court's examination of Juror No. 2 concluded with the following colloquy:

"THE COURT: So you deny or you don't remember making comments to the other jurors that, 'They're all like that. They're all jerks. One of them is a jerk'? You never made any comments like that?

"[Juror No. 2]: How could I come up with a comment like that if I did not have an experience with them? All I know is that I've had tenants that have come to me that said, 'I got a ticket from Code Enforcement.'

"THE COURT: You alluded to that. You're saying you didn't make any statement to the other jurors when you walked in the deliberating room or any time subsequent to walking in initially that either you know from your own personal experience—

"[Juror No. 2]: I don't have a personal experience.

9

"THE COURT: No, no. Listen. Please listen. Please listen.

"—or other people told you that they expressed a negative opinion, using any kind of language that's derogatory, 'they're idiots,' 'they're stupid,' 'they're not smart'? Did you ever tell the jurors anything along those lines?

"[Juror No. 2]: I don't remember saying something like that, no."

The prosecutor asked Juror No. 2 if she "might have a slight bias against" the City. She responded: "I have a bias? The only thing I could think about Code Enforcement is that—the only thing that comes to my mind is that during the time that the incident occurred with [defendant], that I've had people tell me that the City was short on money, or something like that, and they were not getting permits and they weren't getting any buildings being built . . . . [¶] But since my house is in the unincorporated area, . . . I don't have the dealings with the City of Lake Elsinore. I just get information from what other people might have had. That's just kind of general-terms speaking, you know. It's not like they go into detail and actually tell me exactly what happened to them or anything like that . . . ."

In response to another question, Juror No. 2 said her brother and father were architects and that she has built a custom home, so she knows "you can have a massive headache when you have to deal with building inspectors and things like that, because they can throw things at you, 'I want this and this and this,' and it might increase the cost of your construction. [¶] So just generally speaking, the knowledge that I know is that they can make your problem big, you know, or it could be real smooth. . . . I live in the

10

unincorporated area of Lake Elsinore. I know none of the workers that live [*sic*] in City Hall there. I don't know who they are or what."

5. <u>The Court's Second Examination of the Jury Foreman</u>

After Juror No. 2 left the room, the court brought the jury foreman back. The court asked the foreman if he "heard Juror No. 2 at any time, maybe near the beginning of deliberations, maybe right at the beginning, make any comment about Lake Elsinore employees? What did she say about them?" The foreman said: "Actually, that was one of the very first things. She [Juror No. 2] resides in Lake Elsinore. She has personal knowledge that some of the City employees, specifically out of the City Hall area, are not the most—I forget the exact verbiage—ethical, scrupulous. They treat the public mean. That was how we started off. So I directed her, 'Well, we're supposed to set that aside and go on with what we're presented with.'" He added that Juror No. 2 pointed out that she lived in an unincorporated area of Lake Elsinore and had not "personally used City Hall"; she said she used the county for permits and "had negative interaction." The foreman estimated that Juror No. 2 spoke for four or five minutes before she was redirected to the task of deliberating.

The court asked the foreman whether Juror No. 2 was expressing an opinion about City employees or county employees. The foreman responded that he perceived that "she was referring [to] everybody in general, but then she broke it down into, 'I live in the County. I have not had any business dealings with the City itself,' . . ."

11

6. The Court's Ruling

After the foreman left the room, the court asked for counsel's opinions. The prosecutor expressed her view "that Juror No. 2 flat-out lied to the court" and requested she be removed. Defense counsel stated he "wouldn't go so far as she lied. She said she didn't recall." "For the record," he "object[ed] to her being excused."

The court then stated: "But when we talk about equivocating, she had a lot of difficulty focusing to me. She was very evasive in giving me a response. And I think I— three or four times, I think, I directly, very pointedly, asked her a question. The question basically was, 'Did you make any kind of statements to them based upon your personal experience with what people have told you that was in any way derogatory,' and I gave some examples. And it was either, 'No,' or, 'I can't remember.'

"It would seem to me if she were being very honest and forthright, she would have said, 'I said nothing about the City, but I said something about the County or other employees.'

"And [the foreman] indicated that he took it to mean at the outset—these comments were meant in general for everybody who works in that capacity. And then later on she broke it down into specifically being the County.

"Either she out-and-out lied or she forgot. But it appears to me, in either event, she could have clarified it. I think it was clear what I was driving at with her, and she was very evasive in responding. And she could have said, 'I did mention something. I meant it was County.' But she didn't even bring it back to that.

12

"I have problems with her. I don't know if she was forthright to us here in chambers or not. I don't think she was. I think she was equivocating. I think we're losing our two problem jurors. I'm going to exclude her and [Juror No.] 12."

### III. DISCUSSION

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate . . . ." (§ 1089.) "A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge. [Citations.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051; see also *People v. Lomax* (2010) 49 Cal.4th 530, 589.) For example, "a bias against law enforcement officers that renders a juror unable to fairly weigh police testimony is grounds for the juror's replacement. [Citations.] Bias may be established by the testimony of other jurors." (*People v. Barnwell*, *supra*, at p. 1051.) The lack of a juror's forthrightness and candid disclosure regarding the facts suggesting bias may support the court's finding of bias. (*People v. Debose* (2014) 59 Cal.4th 177, 201-202.)

The decision to discharge a juror is "'committed to the sound discretion of the trial court.' [Citations.]" (*People v. Duff* (2014) 58 Cal.4th 527, 560.) Our Supreme Court has cautioned, however, that although "'a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with great care.' [Citation.] The trial court's decision to dismiss a sitting juror will be upheld on review if the juror's inability

13

to serve appears in the record 'as a "demonstrable reality."' [Citation.]" (*People v. Grimes* (2015) 60 Cal.4th 729, 784.) This standard of review is less deferential than the typical abuse of discretion standard. (*People v. Debose*, *supra*, 59 Cal.4th at p. 201; *People v. Fuiava* (2012) 53 Cal.4th 622, 711.) "'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion . . .' that the juror was unable to perform his or her duties. [Citation.] Although a reviewing court will not reweigh the evidence, we 'must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.] In reaching that conclusion, we 'will consider not just the evidence itself, but also the record of reasons the court provides.' [Citation.]" (*People v. Debose*, *supra*, at p. 201.)

In light of these standards and the record in this case, we conclude there was no error. Initially, we note that the prosecution's case was almost entirely based upon the testimony of City employees, in particular, its building department and code enforcement personnel. The testimony of these witnesses often conflicted with the testimony of defense witnesses on material points. Their credibility was therefore critical to the prosecution.

There was substantial evidence that Juror No. 2, at the outset of deliberations, spoke in derogatory terms about City employees for at least four or five minutes, and as much as 10 minutes, before being asked to "set that aside" to begin the task of deliberating. According to Juror No. 12, Juror No. 2 immediately announced that she

14

would like to share something with the other jurors, then spoke for some time about friends who have "had hard times" dealing with Belvin or other City employees, who "mess[] with people for a power trip." He later summarized the gist of her commentary as: "'All Lake Elsinore employees are jerks . . . .'" The foreman, who was otherwise critical of Juror No. 12 and spoke favorably of Juror No. 2, generally corroborated Juror No. 12's statements on this point. He said that Juror No. 2's speech about City employees "was one of the very first things" that happened and recalled that Juror No. 2 spoke from "personal knowledge" about how City employees are not the most "ethical" or "scrupulous," and that "[t]hey treat the public mean."

Juror No. 12 also connected Juror No. 2's derogatory statements with the substantive deliberations by stating that after deliberations began, Juror No. 2 beat around the bush for the "next hour," then stated "'I just don't think this guy is being truthful and the other two employees are on the take.'" Juror No. 12's reference to "this guy" appears to be a reference to Belvin, and the "other two employees" are presumably the two employees who corroborated Belvin's testimony. These statements suggest that Juror No. 2 not only had a bias against City employees, but that her opening monologue was an attempt to color the discussion and to set up her conclusion that Belvin and the two corroborating employees should not be trusted or believed.

In explaining its dismissal of Juror No. 2, the court was particularly troubled by the juror's evasiveness and lack of forthrightness in responding to the court's questions. The court's concern about such behavior is not only appropriate (see *People v. Debose*,

15

*supra*, 59 Cal.4th at pp. 201-202), but well supported by the record. When Juror No. 2 was asked directly if she made any statement during deliberations that Lake Elsinore employees are jerks, she did not answer the question, but instead spoke of people who have received parking tickets or had difficulty getting building permits. When questioned further, she stated that she could not recall making such a statement to the jurors. The court then asked more generally whether she made "any derogatory comments about any Lake Elsinore employees? Yes or no." She stated that she did not think City employees were very smart, but did not actually say whether she had made such a comment to the other jurors.

As our summary of the court's examination of Juror No. 2 indicates, the court appeared to become increasingly exasperated with Juror No. 2's evasive responses. Ultimately, when the court used broad terms to phrase the question whether she made any derogatory statement regarding City employees, Juror No. 2 did not deny making such a statement, answering only that she could not remember. Because this inquiry took place on the second day of deliberations, Juror No. 2's purported inability to remember reflects poorly on her credibility and suggests that she was attempting to avoid disclosing that she had expressed derogatory views about City employees.

Based on the foregoing, the record provides ample evidence that Juror No. 2 made derogatory statements about City employees at the outset of deliberations, possibly for the purpose of coloring the other jurors' perceptions of the employee's testimony, and that she was not forthright and candid during the court's inquiry. It is also clear from the

16

court's comments that the court actually relied on such evidence. The court expressed concern about Juror No. 2 only after learning from Juror No. 12 that deliberations began with Juror No. 2 expressing derogatory statements about City employees. It appears from the record that the court considered excusing Juror No. 2 at that point, but decided to conduct further questioning of Juror No. 2 and the foreman. It was only after the foreman's statements corroborating those of Juror No. 12, and Juror No. 2's evasiveness, that the court made its decision. We are thus satisfied that the demonstrable reality test for our review of a decision to dismiss a juror has been met, and that the court did not abuse its discretion in dismissing Juror No. 2.[2]

Defendant further contends that removal of Juror No. 2 was not justified because her conduct was not "serious and willful." We disagree. As mentioned above, the factual issues in this case depended heavily upon the credibility of the witnesses, and almost all of the material witnesses for the prosecution were employees of the City. Not only were the derogatory statements directly pertinent to the credibility of the employee-witnesses, but Juror No. 2 apparently expounded her views at some length at the outset of deliberations, suggesting an attempt to place the witnesses in a negative light.

## IV.  DISPOSITION

The judgment is affirmed.

---

[2] Defendant also argues that because the record does not reflect a demonstrable reality that Juror No. 2 was unable to serve, her dismissal violated defendant's federal constitutional rights to due process and a fair trial. Because the record does reflect such a demonstrable reality for the reasons stated, defendant's constitutional argument fails.

17

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
                                    J.


We concur:

RAMIREZ _____
                    P. J.

McKINSTER _____
                    J.