Filed 6/24/25  P. v. Jensen CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100156 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE017072) |
| v. | |
| HANS ARTHUR JENSEN, | |
| Defendant and Appellant. | |

As a convicted felon, defendant Hans Arthur Jensen was prohibited from possessing firearms and ammunition.  Based on a tip that defendant had firearms in his house, police searched his house and found seven firearms and an abundance of ammunition.  A jury found defendant guilty of seven counts of possession of a firearm by a felon and one count of possession of ammunition by a felon and he was sentenced to four years in prison.

On appeal, defendant argues (1) the statutes pursuant to which he was convicted violate his Second Amendment rights based on the analysis set forth in *New York State*

*Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*), and (2) the trial court prejudicially erred in delivering a "firecracker" instruction to the jurors to encourage resumed deliberations after the jury indicated it was at a "standstill." We will affirm.

BACKGROUND

*Second Amended Information*

A second amended information charged defendant with seven counts of possession of a firearm by a felon (Pen. Code,[1] § 29800, subd. (a)(1); counts one through seven) and one count of possession of ammunition by a felon (§ 30305, subd. (a)(1); count eight). The information alleged that defendant had a prior serious felony conviction and therefore came within the provisions of the three strikes law (§§ 667, subds. (b)-(i), 1170.12), and further alleged several circumstances in aggravation (Cal. Rules of Court, rule 4.421(a)(10), (b)(1), (b)(3)).

*The Prosecution*

Detective Ryan Franzen of the Sacramento Police Department testified that, on September 22, 2022, he was contacted by an agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives regarding a citizen tip concerning defendant. Franzen verified defendant's address through a driver's license check and through "our history with [defendant] as well as the county system," all of which showed the same address.

Detective Franzen conducted surveillance of defendant's address on two occasions. On one occasion, Detective Franzen observed the house for approximately one hour, and, on the other occasion, he observed the house for several hours. Detective Franzen did not see anyone enter or exit the house on either occasion, and he did not know how many people lived in the house. Detective Franzen ran checks with the Department of Motor Vehicles (DMV) on the vehicles at the residence and found the

---

[1] Further undesignated section references are to the Penal Code.

registered owners to be defendant and his mother. Additionally, the house was defendant's mother's residence. However, defendant's mother had died in February 2021.

On October 12, 2022, Detective Franzen and other officers went to defendant's address to execute a search warrant. Defendant was the only person encountered in the house, and based on what he observed, Detective Franzen believed that only one person lived there.

In the house, Detective Franzen first saw three rounds of Winchester .375-caliber ammunition in a container on the dining room table. On the same table, Detective Franzen saw a bank card in defendant's name.

In the bedroom, law enforcement found a gun safe. The safe was locked and defendant did not provide the lock code. The fire department had to open it. Inside the safe, Detective Franzen found a Winchester .375-caliber center fire rifle, a Glock 43X nine-millimeter handgun, and some documents bearing defendant's name. Detective Franzen testified that the .375-caliber ammunition on the dining room table could be fired from the rifle found in the gun safe. The documents bearing defendant's name and address included DMV paperwork and a superior court document.

In a shed in the backyard, Detective Franzen found a Glock 19X nine-millimeter handgun, nine-millimeter ammunition, and some ammunition magazines in a grocery bag. Detective Franzen also found in the shed a loaded Benelli shotgun, a loaded KelTec shotgun, an unloaded Springfield M1 rifle, and a Glock 17 nine-millimeter handgun. He also located additional ammunition of various calibers in a metal can.

In a detached garage, Detective Franzen found another safe. Again, the safe was locked and the fire department had to assist in opening it. In this safe, Detective Franzen located what he estimated to be several hundred rounds of ammunition of varying calibers as well as additional magazines. Detective Franzen estimated that a tote in which law enforcement placed the ammunition weighed at least 50 pounds.

The parties stipulated that defendant was previously convicted of a felony and was therefore prohibited from owning or possessing firearms. The parties also stipulated that the firearms were examined for fingerprints by law enforcement but no prints were found.

*Verdicts and Sentencing*

The jury found defendant guilty on all counts. Defendant admitted that he had a prior strike conviction. The trial court denied defendant's *Romero* motion to strike his strike prior (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) and sentenced him to four years on count one, consisting of the middle term doubled based on his prior strike. The court imposed middle terms on the remaining counts and stayed execution of those sentences pursuant to section 654.

DISCUSSION

I

*Second Amendment Challenge to Sections 29800 and 30305*

A. *The Challenged Statutes and Defendant's Contentions*

Section 29800, subdivision (a)(1) provides, in part: "Any person who has been convicted of a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."

Section 30305, subdivision (a)(1) provides, in part: "No person prohibited from owning or possessing a firearm under Chapter 2 (commencing with Section 29800) . . . of Division 9 of this title . . . shall own, possess, or have under custody or control, any ammunition or reloaded ammunition."

Defendant argues that his convictions must be reversed because these statutes are facially unconstitutional in violation of the Second Amendment under the analysis set forth in the United States Supreme Court's decision in *Bruen*, *supra*, 597 U.S. at page 1. We disagree, concluding these statutes do not run afoul of the Second Amendment.

B.    *Standard of Review*

"A defendant challenging the constitutionality of a statute carries a heavy burden: 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 696.)  To prevail on a facial challenge, it is not sufficient to show that there could be instances in which the application of the statute might improperly impinge upon constitutional rights.  (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1373.)  Instead, the party challenging the constitutionality of a statute has the heavy burden of demonstrating it is unconstitutional in all or most cases.  (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 54; accord, *Mass v. Franchise Tax Bd.* (2019) 38 Cal.App.5th 959, 963.)

"In analyzing a facial challenge to the constitutionality of a statute, we consider 'only the text of the measure itself, not its application to the particular circumstances of an individual.' " (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474 (*Alexander*).) " 'The interpretation of a statute and the determination of its constitutionality are questions of law' " to which we apply a de novo standard of review.  (*Ibid.*)

C.    *The Second Amendment and United States Supreme Court Case Law*

The Second Amendment to the United States Constitution provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  (U.S. Const., 2d Amend.)

In *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), the United States Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment . . . ."  (*Id*. at p. 635.)  According to the Supreme Court, "the inherent right of self-defense has been central to the Second Amendment right."  (*Id*. at p. 628.)  The "core lawful purpose" of the Second Amendment is self-defense.  (*Heller*, at p. 630.)  As restated in *Bruen*, in *Heller*, the Supreme Court for the first time held that the Second Amendment protects "an individual right to keep and bear

arms for self-defense." (*Bruen, supra*, 597 U.S. at p. 17.) In *McDonald v. Chicago* (2010) 561 U.S. 742, the United States Supreme Court held that the Second Amendment right outlined in *Heller* "is fully applicable to the States." (*McDonald*, at p. 750.)

The Second Amendment right to bear arms is not unlimited. (*Heller, supra*, 554 U.S. at p. 595.) It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id*. at p. 626.) The Supreme Court in *Heller* noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (*Id*. at pp. 626-627, fn. omitted.) In a footnote, the court noted that it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." (*Id*. at p. 627, fn. 26.)

In the years after *Heller* and *McDonald*, the federal courts of appeals "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." (*Bruen, supra*, 597 U.S. at p. 17.) The Supreme Court in *Bruen* rejected that framework: "we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Ibid*.)

In *Bruen*, the United States Supreme Court discussed its recognition of the individual right to possess guns in *Heller* and *McDonald*: "we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen

6

to possess a handgun in the home for self-defense." (*Bruen*, *supra*, 597 U.S. at pp. 8-9.) The Supreme Court also repeatedly characterized the petitioners in *Bruen* as law-abiding citizens seeking to carry handguns in public for self-defense (*id*. at pp. 9-10, 15, 31-32), and noted that they were "two ordinary, law-abiding, adult citizens" who were "part of 'the people' whom the Second Amendment protects" (*id*. at pp. 31-32). In finding the law challenged in *Bruen* unconstitutional, the Supreme Court stated that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." (*Id*. at p. 71.)

More recently, in *United States v. Rahimi* (2024) 602 U.S. 680, the United States Supreme Court upheld a federal statute prohibiting possession of firearms by persons subject to domestic violence restraining orders "if that order includes a finding that [the person to be restrained] 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." (*Id*. at p. 685.) After reviewing the history of disarmament and firearm regulation under English and early American law, the Supreme Court concluded that historical firearm regulations "confirm[ed] what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." (*Id*. at pp. 693-697, 698.) The Supreme Court yet again reiterated that "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " (*Id.* at p. 699, quoting *Heller*, *supra*, 554 U.S. at pp. 626, 627, fn. 26.)

D.      *Post-Bruen Challenges to Sections 29800 and 30305*

Less than one year after the Supreme Court decided *Bruen*, the Fourth District Court of Appeal, Division Two, decided *Alexander*, *supra*, 91 Cal.App.5th at page 469. The defendant in *Alexander* raised facial challenges to the same statutes as those at issue here. (*Id*. at p. 474.)

7

As a threshold issue, the Court of Appeal considered "whether the challenged conduct . . . is covered by the Second Amendment." (*Alexander*, *supra*, 91 Cal.App.5th at p. 478.) The court concluded "it is not, because according to *Heller* and *Bruen* only law-abiding citizens are included among 'the people' whose right to bear arms is protected by the Second Amendment." (*Ibid*.) The court emphasized numerous passages in *Heller* and *Bruen* discussing the Second Amendment rights of "law-abiding" citizens. (*Id*. at pp. 478-479.) The court concluded: "*Heller* and *Bruen* both held that the Second Amendment protects the individual right of ' "law-abiding, responsible citizens" ' to possess firearms. [Citations.] Convicted felons, by definition, are not law abiding. Felons thus are not among 'the people' who have an individual right to possess firearms under the Second Amendment. [Citation.] We consequently conclude that Alexander's challenges to the constitutionality of section 29800(a)(1) and section 30305(a)(1) under the Second Amendment fail under the first step of *Bruen*'s analytical framework." (*Id*. at p. 479.)

The court agreed with the defendant that "*Heller*'s list of regulations that the Court considered presumptively valid was dicta . . . ." (*Alexander*, *supra*, 91 Cal.App.5th at p. 480.) But that court further stated: "*Heller* defined the right protected by the Second Amendment as belonging to 'law-abiding, responsible citizens' [citation], and *Bruen* reaffirmed that limitation [citation]. *Heller*'s dicta about the presumed validity of laws prohibiting felons from possessing firearms is consistent with the court's explanation of the scope of Second Amendment rights." (*Ibid*., citing *Bruen*, *supra*, 597 U.S. at pp. 10, 26, 29, 71 & *Heller*, *supra*, 554 U.S. at p. 635.) The court also rejected the defendant's contention that the Second Amendment does not protect only law-abiding citizens, but instead confers the right "on ' "all members of the political community." ' " (*Alexander*, at p. 480.) The court acknowledged *Heller*'s language stating that "there is 'a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.' " (*Ibid*.) However, the court further relied on the fact that, in "explaining

8

the scope of the individual right, the [United States Supreme Court] repeatedly described the right as belonging to 'law-abiding citizens,' " and stated it could not "ignore the court's guidance." (*Ibid*.) Thus, the court in *Alexander* concluded that the statutes "are facially valid because the possession of firearms and ammunition by convicted felons is not conduct covered by the Second Amendment." (*Ibid*.)

In *People v. Odell* (2023) 92 Cal.App.5th 307, the Second District Court of Appeal, Division Eight, agreed with *Alexander*, concluding that section 29800, subdivision (a)(1) was constitutional. (*Odell*, at pp. 316-317.) The court found it to be "no accident the *Bruen* majority repeated the qualifier 'law-abiding' some 13 times." (*Id*. at p. 317; see also *In re D.L.* (2023) 93 Cal.App.5th 144, 166 ["We agree with *Alexander* and *Odell* . . . that those convicted of a felony are squarely in a category where gun possession is off-limits due to their prior criminal conduct"].) The Fourth District Court of Appeal, Division Three, followed suit, agreeing with "the cogent reasoning and analysis in *Alexander*," in holding that section 30305, subdivision (a)(1) does not violate the Second Amendment. (*People v. Ceja* (2023) 94 Cal.App.5th 1296, 1301.)

In *People v. Anderson* (2024) 104 Cal.App.5th 577, however, the First District Court of Appeal, Division Three, disagreed with *Alexander*. The court acknowledged that "*Heller* and *Bruen* do characterize the Second Amendment right as one belonging to 'law-abiding citizens.' " (*Id*. at p. 587.) The *Anderson* court, however, rejected the conclusions in *Alexander* and the cases that followed. (*Id*. at pp. 588-589.) Under its analysis, neither *Heller* nor *Bruen* presented the question whether nonlaw-abiding citizens possess Second Amendment rights. (*Anderson*, at p. 588.) According to *Anderson*, when *Heller* "expressly addressed the question of who enjoys rights under the Second Amendment, the court concluded the right 'belongs to all Americans.' " (*Anderson*, at p. 588, citing *Heller*, *supra*, 554 U.S. at p. 581.) Defendant urges us to follow *Anderson* this far, but no farther. Following a survey of relevant historical regulatory antecedents, the *Anderson* court concluded that subdivision (a)(1) of

9

sections 29800 and 30305 were constitutional "as they are 'consistent with the principles that underpin' this nation's 'regulatory tradition.' " (*Anderson*, at p. 582.)

Most recently, in *People v. Richardson* (2025) 108 Cal.App.5th 1203, the Second Appellate District, Division Eight, agreed with *Alexander* and *Odell* that, under United States Supreme Court precedent, "only 'law-abiding' citizens are among the class of people covered by the text of the Second Amendment." (*Richardson*, at p. 1212.) Therefore, because the possession of firearms and ammunition by felons is not protected under the Second Amendment, subdivision (a)(1) of sections 29800 and 30305 are constitutional. (*Richardson*, at p. 1212.) The *Richardson* court went further, concluding that, even if convicted felons *were* covered under the Second Amendment, the *Anderson* court correctly determined that these statutes were "consistent with our national tradition of firearm regulation and, as such, are facially valid." (*Richardson*, at p. 1212.)

E.      *Analysis*

The United States Supreme Court in *Bruen* stated that, in *Heller* and *McDonald*, it "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." (*Bruen*, *supra*, 597 U.S. at pp. 8-9.) As the court went on to hold, under the test established in *Heller* and applied in *Bruen* (*id*. at p. 26 [discussing the "test that we set forth in *Heller* and apply today"]), when "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" (*id*. at pp. 17, 24). Thus, only if the Second Amendment covers an individual's conduct does a court proceed to address whether the government can demonstrate that a challenged law is consistent with this "Nation's historical tradition of firearm regulation." (*Bruen*, at pp. 17, 24.)

Defendant has not persuaded us that *Alexander* and the cases that followed it were wrongly decided. The conduct at issue is defendant's possession, as a prohibited person, specifically a felon, of firearms (§ 29800, subd. (a)(1)) and ammunition (§ 30305, subd. (a)(1)). The United States Supreme Court directs us first to determine whether this

10

conduct is covered by the Second Amendment. (*Bruen*, *supra*, 597 U.S. at pp. 17, 24.) Based on the Supreme Court's repeated, presumably deliberate specification that the Second Amendment protects the right *of law-abiding citizens* to keep and bear arms (*Bruen*, at pp. 8-9, 26; *Heller*, *supra*, 554 U.S. at p. 635), we agree with those cases holding that the conduct such as that at issue here is not covered by the Second Amendment (see *Alexander*, *supra*, 91 Cal.App.5th at pp. 478-480; see also *People v. Richardson*, *supra*, 108 Cal.App.5th at p. 1212; *People v. Ceja*, *supra*, 94 Cal.App.5th at p. 1301; *In re D.L.*, *supra*, 93 Cal.App.5th at p. 166; *People v. Odell*, *supra*, 92 Cal.App.5th at pp. 316-317; but see *People v. Anderson*, *supra*, 104 Cal.App.5th at pp. 588-589). Accordingly, we reject defendant's Second Amendment challenge.

II

*"Firecracker" Instruction*

A.     *Additional Background*

The jury began deliberating at 3:49 p.m. on October 16, 2023, and deliberated until 4:30 p.m. The jury resumed deliberations at 9:00 a.m. on October 17, 2023, and, at 9:41 a.m., submitted a note to the trial court asking for the definition of "legal possession." At 10:12 a.m., the jury submitted a second note that is not relevant here.

At 3:00 p.m., the jury submitted a third note: "Directions or advice on how to proceed for non-unanimous consensus and standstill on counts 1-7. [¶] We have reached consensus on count 8. Should we send that verdict now or should all . . . verdicts be sent at once?" It was not until the next day that the trial court and counsel discussed the "firecracker" instruction. The court noted that the jury had deliberated for a couple of hours after submitting its note. The court stated it intended to give the "firecracker" or *Moore* instruction. (See *People v. Moore* (2002) 96 Cal.App.4th 1105.) Neither counsel objected. At 9:24 a.m., the trial court instructed the jury:

"It has been my experience on more than one occasion that a jury initially reporting that it was unable to reach a verdict was ultimately able to arrive at a verdict. To assist you in your further deliberations, I am going to instruct you as follows:

"Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so, based solely on the evidence presented and without regard to the consequences of your verdict, regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh and evaluate all the evidence presented at the trial, to discuss your views regarding the evidence and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs. You should not hesitate to change a view that you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong.

"Fair and effective jury deliberations require a frank and forthright exchange[] of views.

"As I previously instructed, each of you must decide the case for yourself. You should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges if you can do so without violence to your individual judgment.

"Both the People and the Defendant are entitled to the individual judgment of each juror. As I previously instructed, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

"May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen, that you consider changing the methods you have been following, at least temporarily, and try new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time or you may wish to experiment with reverse role playing

12

by having those on one side of an issue present and argue the other side's position and vice versa.

"This might enable you to better understand the others' positions.

"By suggesting you should consider changes in your methods of deliberations, I want to stress that I am not dictating or instructing you as to how to conduct your deliberations. I merely suggest that you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also ask that you reread instruction 200 and instruction 3550. These instructions pertain to your duties as jurors and make recommendations concerning the process of deliberations. The integrity of a trial requires that all jurors at all times during their deliberations conduct themselves as required by the instructions.

"Instruction 200 defines the duties of a juror.

"The decision the jury renders must be based on the facts and the law. You must determine what facts have been proved . . . from the evidence received in the trial and not from any other source. A fact is something proved by the evidence.

"Second, you must apply the law I state to you to the facts as you determine them, and in this way arrive at your verdict.

"You must accept and follow the law as I state it to you regardless of whether you agree with the law.

"If anything concerning the trial said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, of course, you must be following my instructions.

"Instruction 3550 defines the jury's duty to deliberate and recommends how jurors should approach their task. The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court. These are the matters this instruction requires you to discuss for the purpose of reaching a verdict.

13

"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments, and suggestions that I have made in the instructions now presented to you. I hope my comments and suggestions may be of some assistance to you.

"You are ordered to continue your deliberations at this time. If you have any other questions, concerns, requests or any communications that you desire to report to me, please put those in writing on the form provided."

At 10:06 a.m., 42 minutes after the trial court delivered this instruction, the jury submitted verdicts to the trial court on all counts.

B.    *Defendant's Contentions and Forfeiture*

Defendant argues that the trial court prejudicially erred in delivering this instruction after the jury deadlocked. Defendant contends that the instruction was inherently coercive. Even if it was not inherently coercive, defendant asserts that the trial court abused its discretion in giving the instruction because the court had no reasonable basis to believe that further deliberations would aid the jury's understanding of the case. Acknowledging that his attorney did not object to the instruction, defendant argues that we may reach the issue because the instruction affected his substantial rights. (See § 1259 [appellate court may review any instruction, even though no objection was made in the trial court, if the defendant's substantial rights were affected].)

Whether or not defendant forfeited this contention, we exercise our discretion to address it on its merits as an alternative to considering his ineffective assistance of counsel claim. We conclude the "firecracker" instruction was not inherently coercive and the trial court did not abuse its discretion in giving it.

C.    *Applicable Principles of Law*

"Section 1140 provides in relevant part that a 'jury cannot be discharged' without having rendered a verdict unless, 'at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can

14

agree.' 'The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 88.)

"Coercion occurs where 'the trial court, by insisting on further deliberations, expresse[s] an opinion that a verdict should be reached.' " (*People v. Peoples* (2016) 62 Cal.4th 718, 783.) " 'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived " 'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.' " ' " (*People v. Debose* (2014) 59 Cal.4th 177, 209.) " '[A]ny claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case.' " (*People v. Brooks*, *supra*, 3 Cal.5th at p. 88.)

D.    *Coerciveness*

Defendant compares the instruction given here to an "*Allen* charge." (See *Allen v. United States* (1896) 164 U.S. 492.) The *Allen* instruction, and instructions patterned after it, were disapproved for use by the California Supreme Court as a "discriminatory admonition directed [only] to minority jurors to rethink their position in light of the majority's views." (*People v. Gainer* (1977) 19 Cal.3d 835, 845 (*Gainer*), disapproved on another ground in *People v. Valdez* (2012) 55 Cal.4th 82, 163.) Such instructions also included a legally inaccurate statement "that a criminal case 'must at some time be decided,' " whereas it is possible, for example, that the prosecution could opt for dismissal. (*Gainer*, at p. 852.) Thus, the California Supreme Court concluded that it is in error to give an instruction "which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will

15

necessarily be retried." (*Ibid*.) Defendant argues the instruction given here contained similar defects. We disagree.

Defendant identifies as problematic under *Gainer* the following passage from the trial court's instruction: "In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs. You should not hesitate to change a view that you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong." He argues this language is like that from *Allen*, which directed: " 'if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one . . . .' " (*Gainer*, *supra*, 19 Cal.3d at p. 845, quoting *Allen v. United States*, *supra*, 164 U.S. at p. 501.) Defendant acknowledges that the instruction given here did not expressly single out dissenting jurors, but argues that it nevertheless amounted to the same " 'extraneous majoritarian appeal' " decried in *Gainer*. (*Gainer*, at p. 848.) We cannot agree. The plain language of the instruction did not refer to or single out dissenting jurors or viewpoints, but rather encouraged *all jurors* to reexamine their views. Elsewhere, the instruction informed the jury that "the People and the Defendant are entitled to the individual judgment of each juror."

Defendant argues that the fact that the jury reached a verdict so soon after the trial court gave the instruction strongly suggests that the majority favored conviction, and therefore "the coercive effect on the minority was the same here" as in the *Allen* charge. We reject this contention. Again, the instruction was neutral and encouraged all jurors to reexamine their positions. We cannot deem the instruction to be coercive merely because the jury reached a verdict soon after being instructed with it, or based on defendant's speculation as to the breakdown of jurors favoring conviction and acquittal during deliberations.

Next, defendant emphasizes these portions of the trial court's instruction:

16

"Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so, based solely on the evidence presented and without regard to the consequences of your verdict, regardless of how long it takes to do so.

"It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges if you can do so without violence to your individual judgment.

"You are ordered to continue your deliberations at this time."

Defendant asserts that these instructions ran counter to *Gainer*'s criticism of the directive that " 'You should consider that the case must at some time be decided.' " (*Gainer*, *supra*, 19 Cal.3d at p. 851.) Not so. Again, the California Supreme Court in *Gainer* disapproved of this language because it was legally inaccurate; it "is simply not true that a criminal case 'must at some time be decided.' " (*Id*. at p. 852.) "[A]n instruction which implies that a hung jury will assuredly result in a retrial misstates the law . . . ." (*Ibid*.) The instruction given here does not contain the infirmity addressed in *Gainer*. The instruction described to the jurors their "goal" of reaching a verdict "if you are able to do so," and "regardless of how long it takes to do so." It instructed the jurors that they had a duty "to deliberate with the goal of arriving at a verdict on the charges if you can do so without violence to your individual judgment." These instructions did not contain the "legally inaccurate" representation that the case " 'must at some time be decided.' " (*Id*. at p. 852.) Lastly, we cannot conclude that the last portion of this portion of the instruction was coercive in which the trial court merely directed the jurors to resume deliberations.

Defendant argues that certain of the trial court's comments during voir dire "aggravated this error." However, we have concluded that the instructions were not coercive or erroneous as asserted by defendant. In any event, in its remarks during voir dire, the trial court stated: "If you are a juror, you've got to make a decision. That's what jurors do, and the nature of a trial is that you're getting everything secondhand. The mechanism of a trial is where evidence is brought in, witnesses testify, video may be

17

shown.  Depending upon the case, we may have video.  We may have audio, but all of this is secondhand.  Even the video and audio obviously is secondhand.  It's not exactly the same as if you were there seeing the thing yourself. . . .  So you're getting it secondhand.  [¶]  And there are some people who would say, you know what, if there's evidence about the barn being orange and other evidence about the barn being red, I wasn't there, I'm just going to throw up my hands and go home, I can't decide this.  [¶] Well, that doesn't work.  Jurors need to sit down and make these decisions.  Is there anybody who feels like, you know what?  You described me.  I'm one of those people, I've got to see it to believe it.  I've got to be there.  Anybody feel like that describes them?  Any hands?  [¶]  Anybody feel that describes them?  I've got to see it myself?  [¶] And no hand[s] are raised on that."

Again, these remarks did not contain the "legally inaccurate" advisement that a criminal case " 'must at some time be decided.' "  (*Gainer*, *supra*, 19 Cal.3d at p. 852.) These remarks advised the potential jurors of their duty to decide the case based on the evidence (see *People v. Henderson* (2022) 78 Cal.App.5th 530, 546 [the "duties of a juror include the duty to set aside personal feelings and opinions and decide the case based solely on the evidence and instructions provided by the court"]), including resolving factual disputes (see *People v. Ruiloba* (2005) 131 Cal.App.4th 674, 692 [jury's job is to find the facts]), and asked if there were any among them unwilling or unable to do so.

Defendant claims the trial court in its remarks did not specify that the jury should deliberate with the goal of reaching a fair and impartial verdict "only if it was able to do so and only if it could conscientiously do so."  However, in the very remarks defendant faults, the court specified that the jurors' goal was to "reach a fair and impartial verdict if you are able to do so, based solely on the evidence presented and without regard to the consequences of your verdict . . . ."  And the court specified the jurors had the duty to deliberate "with the goal of arriving at a verdict on the charges *if you can do so without violence to your individual judgment*."  (Italics added.)

18

Defendant attempts to distinguish *People v. Moore*, *supra*, 96 Cal.App.4th at page 1105, although he correctly acknowledges that court upheld an instruction largely identical to the one issued here. (See *id*. at pp. 1118-1120, 1121-1122.) He also argues that *Moore* was wrongly decided. We disagree on both counts. For the reasons discussed above, we conclude that the instruction given here, like the instruction given in *Moore*, was not coercive under *Gainer*.

E.    *Abuse of Discretion*

Defendant argues that, even if the instruction was not inherently coercive, the trial court abused its discretion in ordering further deliberation. He asserts that there was no reasonable basis for the trial court to believe that further deliberations would aid the jury's understanding of the case. We disagree.

As stated, "[c]oercion occurs where 'the trial court, by insisting on further deliberations, expresse[s] an opinion that a verdict should be reached.' " (*People v. Peoples*, *supra*, 62 Cal.4th at p. 783.) Among other things, defendant relies on the comparative duration of the deliberations, "nearly three times as long as the presentation of evidence at trial," and the fact that the trial court did not inquire of the jurors as to the nature of their impasse or ask whether specific information would assist the jurors in their deliberations.

Taking the latter contention first, a trial court is not required to question the jurors in determining whether there is a reasonable probability that the jurors can agree on a verdict. (*People v. Peoples*, *supra*, 62 Cal.4th at p. 782.) " 'While the trial court has a duty to avoid coercing the jury to reach a verdict, . . . inquiry as to the possibility of agreement is "not a prerequisite to denial of a motion for mistrial." ' [Citation.] Thus, a trial court does not abuse its discretion merely by declining to poll the jury as to the likelihood of reaching a unanimous verdict." (*Ibid*.)

Furthermore, we conclude the trial court had a reasonable basis to conclude that further deliberation would aid the jury in its understanding of the case. The jury's note

stated: "Directions or advice on how to proceed for non-unanimous consensus and standstill on counts 1-7. [¶] We have reached consensus on count 8. Should we send that verdict now or should all . . . verdicts be sent at once?" Thus, the jury had demonstrated it could reach a verdict as to one count. Moreover, the jury's question of whether it should send its resolved verdict at once or instead if all of the verdicts should be sent at the same time could suggest the jury's acknowledgment that, notwithstanding being at a "non-unanimous consensus and standstill on counts 1-7," the jury believed it was capable of reaching a verdict. The same could be said for the jury's question as to how it should "proceed." Defendant disagrees and claims this constitutes an "unfounded" "overread[ing]" of the jury's note, arguing that the "note only shows the jury wanted advice on the procedural question of when to send the verdict forms in" for counts one through seven. This is one conceivable interpretation of the jury's note. However, as we have concluded, another interpretation is that the jury was requesting guidance on how to proceed with its deliberations. Additionally, the note did not describe an insuperable deadlock. The jury did not affirmatively state that it could not or would not be able to reach an agreement.

We conclude that the trial court had sufficient information upon which to make a reasoned determination and did not abuse its discretion in impliedly finding that there was a "reasonable probability" (§ 1140) that the jury could agree on a verdict.

Defendant is correct that the presentation of evidence in this case was relatively brief and the circumstances not particularly complex. The prosecution's case consisted of a single witness who testified for approximately two hours and 22 minutes. Essentially the only issues to be decided by the jury were whether defendant possessed, and knew he possessed, the firearms and ammunition. It appears that the jury deliberated for approximately eight hours before returning its verdicts. However, the fact alone that the jury's deliberations lasted longer than the presentation of evidence does not undermine

20

the trial court's reasoned determination that there was a reasonable probability that, with further deliberations, the jury could agree on a verdict.

Additionally, defendant emphasizes the fact that the jury reached a verdict approximately 42 minutes after the trial court delivered the "firecracker" instruction. That a jury returns its verdict soon after receiving a supplemental instruction may suggest the *possibility* of coercion. (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 240.) However, it is not *determinative*, and the fact that defense counsel did not object can indicate that any potential for coercion "was not apparent to one on the spot." (*Ibid.*; accord, *People v. Whaley* (2007) 152 Cal.App.4th 968, 983.)

The trial court did not abuse its discretion in its instruction to the jury.

## DISPOSITION

The judgment is affirmed.

_____\s\_____
Krause, J.

We concur:

_____\s\_____
Earl, P. J.

_____\s\_____
Hull, J.